CARNEGIE-ILLINOIS STEEL CORPORATION *v.* GEORGE P. ALDER-SON, *etc.*

(No. 9668)

Submitted April 10, 1945. Decided July 3, 1945.

*Arthur S. Dayton* and *J. Newton Harman,* for appellant.

*Ira J. Partlow,* Attorney General, and *Kenneth E. Hines,* Assistant Attorney General, for appellee.

KENNA, JUDGE:

This proceeding was brought under the provisions of Code, 11-13-8, in the Circuit Court of Kanawha County by Carnegie-Illinois Steel Corporation against George P. Alderson, as Tax Commissioner of the State of West Virginia and individually for the purpose of enjoining him from paying into the treasury of the State of West Virginia $8,696.49 paid to him by the complainant under protest to meet a quarterly assessment under the West Virginia Business and Occupation Tax Act for the quarter beginning January 1, 1941, and ending March 31 of that year. From an order sustaining a demurrer to the bill of complaint and dismissing the cause this appeal was granted upon the petition of the complainant below.

The allegations of the bill of complaint fully set out the circumstances, contractual and otherwise, under which the complainant is operating as lessee under a written lease from the United States Government and for its exclusive benefit the factory usually known as "The Naval Ordnance Plant" in South Charleston, Kanawha County, for the purpose of performing part of the processes essential to the manufacture of armor plate and deck plate used in the construction of war ships. At various times under what is called a "lump sum" or fixed price basis, contracts for the manufactured product, being separate and distinct from the lease dated January 4, 1940, under which the Steel Company is occupying the plant, the latter agreement having been preceded by a similar lease dated June 8, 1939, were entered into. The substance of these several contracts is set up in the bill.

The lease of the plant was for an indeterminate period of not more than three years, revocable at the discretion of the Secretary of the Navy or by the complainant upon sixty days notice in writing, granted the use of the machinery, equipment and facilities at a stated monthly rental and provided that there should be an additional monthly rental for each furnace used. The lease further recited a number of material contracts that the Steel

Company had entered into with the Government of the United States, and contained an express provision that the use of the armor plate plant by the lessee should be confined solely to the manufacture of armor plate and deck plate for the use of the Federal Government. The bill of complaint also alleges the general terms of the so-called "lump sum" contract, which we do not consider necessary to recount here except to state that there is provision for highly rigid and continuous inspection apparently accompanied by the arbitrary right to reject by the Navy Department, the contractor being required to proceed with production in spite of disputes which might arise.

The bill of complaint alleges in some detail the circumstances and history concerning the acquisition of the government reservation in South Charleston and the construction thereon of the Naval Ordnance Plant, showing that the plant was completed in the latter part of the year 1918 at the end of the first World War and that its intended use as a factory was abandoned by the Government until after the date of the first lease •with the complainant, or June 8, 1939, and that during the intervening period following its construction it had been placed in the custody of the armed forces of the United States.

The bill of complaint also alleges that the Naval Ordnance Plant is the only plant owned by the United States Government for the manufacture of armor plate or deck plate and that complainant and two other companies are the only concerns in the United States that have the technical organization required to produce either.

After alleging the fact that the leases of the complainant of the property at South Charleston and the contracts for armor plate and deck plate entered into by it with the Federal Government were for the purpose of meeting a national emergency, the bill of complaint proceeds to assign ten specific grounds of relief as follows: First, that the activities performed by the complainant were upon property within the exclusive jurisdiction of the United States Government because title thereto ·was

vested in it, regardless of the so-called "Buck Act", which did not alter the effect of a pre-existing lease, the effective date of the act in question being January 1, 1941; second, that the complainant, in performing the activities in question, was, in contemplation of law, an instrumentality of the United States Government; third, that the complainant was an agent carrying out a sovereign function; fourth, that to collect the levy in question would impose a substantial burden upon the Government of the United States in exercising a soverign function; fifth, the same as four except that it relates to hindering a sovereign function; sixth, that it is in violation of the sovereign immunity from taxation of the United States Government; seventh, that the levy referred to is beyond the jurisdiction of the State of West Virginia; eighth, that it is in violation of the Constitution of the United States as an invasion of the powers, jurisdiction and immunity of the Federal Government; ninth, that to impose the tax is beyond the legal and territorial jurisdiction of the State of West Virginia, its officers and agents; and tenth, that the tax is in violation of Article 1, Section 1 of the Constitution of the State of West Virginia.

The assigned grounds of demurrer were: First, that the affirmative allegations of the bill of complaint show that the complainant is subject to the tax imposed; second, that the so-called "Buck Act" authorizes the imposition of a privilege tax by the different states upon businesses, occupations or activities conducted therein upon property owned by the United States Government; third, the allegations of the bill of complaint show that the tax imposed is not a tax upon the lease of complainant from the United States Government nor upon the contracts between the plaintiff and it, but is a tax imposed upon the privilege of doing business within this State, the amount of which is gauged by the gross return from that business; fourth, there is no federal legislation exempting plaintiff from the tax imposed; fifth, the allegations of the bill of complaint fail to show that the complainant is an instrumentality of the United States Government; sixth, that the assessment in question does

not impose a direct burden upon the United States Government, though the allegation of the bill of complaint that in the future it will increase the cost of complainant's product may be true; and eighth, that the imposition of the tax in question violates no statutory nor constitutional provision.

In sustaining the demurrer to the bill of complaint the trial chancellor did not distinguish as between the eight assigned grounds and since, with the exception of the ground predicated upon the so-called "Buck Act", they are so intimately related as to invite common discussion in the opinions of the Supreme Court of the United States that our judgment must undertake to follow, we will not attempt to further divide the principal question into what may be its components as has been done by the demurrant.

As to the effect of what has become popularly known as the "Buck Act" (Public Act No. 819, 54 Stat. 1059, 4 U. S. C. A. Sec. 14) upon the then recognized immunity of the United States Government, the only indication of the attitude of the United States Supreme Court to which we have been referred or could find is that of the case of *Kiker* v. *City of Philadelphia,* 346 Pa. 624, 31 A. 2d 289, decided by a divided Court, to the judgment of which the United States Supreme Court declined a writ of certiorari, (320 U. S. 741). The case involved the question of whether an ordinance of the City of Philadelphia imposing an income tax upon its residents applied to a person employed in the Philadelphia Navy Yard on League Island, owned by the United States. The majority of the Supreme Court of Pennsylvania held that it did, under the Act of Congress in question, and expressed its views in a rather exhaustive opinion, the substance of which, in our judgment, is sound.

The further question is raised that since the "Buck Act" became effective October 9, 1940, it should not be applied to a pre-existing contractual relationship, but that such a relationship should be governed by the then law. This question can involve only the due process clause and since immunity from taxation is a sovereign

privilege and not a litigable right we are of the opinion that the Act of Congress in question in its operation is not restricted by the due process clause.

The remaining points of demurrer are dealt with in a blended sense in the opinions of the United States Supreme Court hereafter cited which we trust we may apply.

In 1928 the Supreme Court of the United States, in a case brought there from the Supreme Court of the State of Mississippi, styled *Panhandle Oil Company* v. *Mississippi ex rel. Knox, Attorney General,* 277 U. S. 218, Justices Holmes, Brandeis, Stone and McReynolds dissenting, held that a gasoline dealer was immune from the levy of a state privilege tax upon the amount of gasoline sold directly to the United States for the use of its Coast Guard Fleet and its Veterans Hospital at Gulf Port, Mississippi, the majority opinion being based upon what is now referred to as the "economic burden" reasoning, roughly meaning that under the circumstances shown the United States Government is bearing the tax load of a state levy. Since the decision of the *Panhandle* case, without expressly overruling that holding, the Supreme Court of the United States has quite considerably modified its treatment of the principles involved, and since the cases involving that modification are thoroughly discussed in subsequent opinions of that Court, monographs and law review articles, all readily available, we will refer to them only as source material.

In 1936 the Supreme Court of the United States approved its finding in the *Panhandle* case in the case of *Graves, Governor of Alabama, et al.* v. *Texas Company,* 298 U. S. 393, 56 S. Ct. 818, 80 L. Ed. 1236, from the United States District Court for the Middle District of Alabama, Justice Stone not participating and Justices Cardozo and Brandeis dissenting.

In 1937, in the case of *James* v. *Dravo Contracting Company,* 302 U. S. 134, 58 S. Ct. 208, 82 L. Ed. 155, that went up from the District Court for the Southern District of West Virginia, the Court, again divided (Justices Roberts, McReynolds, Sutherland and Butler dis-

senting) distinguished its ruling in the *Panhandle* case and held that a contractor engaged in the construction of locks and dams on the Kanawha River under a direct contract with the Federal Government was not immune from the payment of a state privilege tax based upon gross receipts. A lengthy review of similar cases will be found in the majority opinion beginning at page 151 and in the dissent written by Justice Roberts.

In the case of *Helvering, Commissioner of Internal Revenue* v. *Mountain Producers Corporation* (1938), 303 U. S. 376, 58 S. Ct. 623, 82 L. Ed. 907, the Supreme Court held, among other things, that under an oil and gas lease from the State of Wyoming the income of a *cestui que* trust under a declaration of trust made by the lessee was subject to the Federal income tax notwithstanding a claim of immunity which rested upon the contention that the taxpayer was an instrumentality of the State of Wyoming and consequently, at that time, exempt from the imposition. Justices Cardozo and Reed did not participate and Justices Butler and McReynolds dissented.

In the case of *Alabama* v. *King & Boozer* (1941), 314 U. S. 1, 62 S. Ct. 43, 86 L. Ed. 3, by an undivided Court it was held that a contractor purchasing materials to be used in the performance of a contract to construct a building for the United States Government on a "cost plus" basis would be required to pay a state sales tax upon the price of lumber purchased for that purpose. Mr. Justice Stone, speaking for the Court, comments upon the fact that the Government does not contend in that case that the taxpayer can claim immunity because the tax burden would eventually and indirectly fall upon the Federal Government in the absence of an Act of Congress granting that immunity. It is claimed that this line of reasoning gives rise to the theory of "degree" as controlling the question of economic burden.

The case of *Curry* v. *United States,* 314 U. S. 14, 62 S. Ct. 48, 86 L. Ed. 9, was a companion case involving almost the same set of facts as the *King* case, the Supreme Court holding that contractors in the purchase of build-

ing materials for a structure being erected for the Government are not instrumentalities of the United States.

In the case of *Standard Oil Company of California* v. *Johnson* (1942), 316 U. S. 481, 62 S. Ct. 1168, 86 L. Ed. 1611, decided in 1942, the Supreme Court held that a distributor of motor fuel was not to be charged with the sales tax on gasoline sold to an Army post exchange because the buyer was an arm of the Federal Government, due to the exchange being operated for the benefit and entirely under the control of the War Department, despite the fact that the Government assumed no financial responsibility, the opinion being based upon congressional recognition of the post exchange as an integral part of the Government of the United States.

In the case of *Penn Dairies, Inc.* v. *Milk Control Commission of Pennsylvania* (1943), 318 U. S. 261, 63 S. Ct. 617, 621, 87 L. Ed. 748, the question involved was whether the license of a milk dealer was properly refused renewal by the Commission due to the fact that the dealer had sold milk to the United States at a price below that prescribed by state law. The Supreme Court approved the refusal, Justice Rutledge not participating, and Justices Douglas, Black and Jackson dissenting, the Court's opinion reasoning that in the absence of an exemption granted by Congress contractors are subject to local price fixing regulations. The opinion prepared by Chief Justice Stone in part reads as follows:

> "The trend of our decisions is not to extend governmental immunity from state taxation and regulation beyond the national government itself and governmental functions performed by its officers and agents. We have recognized that the Constitution presupposes the continued existence of the states functioning in coordination with the national government, with authority in the states to lay taxes and to regulate their internal affairs and policy, and that state regulation like state taxation inevitably imposes some burdens on the national government of the same kind as those imposed on citizens of the United States within the state's borders, see Metcalf & Eddy v. Mitch-

ell, supra, 269 U. S. at page 523, 524, 46 S. Ct. at page 174, 70 L. Ed. 384. And we have held that those burdens, save as Congress may act to remove them, are to be regarded as the normal incidents of the operation within the same territory of a dual system of government, and that no immunity of the national government from such burdens is to be implied from the Constitution which established the system, see Graves v. People of State of New York ex rel. O'Keefe, 306 U. S. 466, 483, 487, 59 S. Ct. 595, 599, 601, 86 L. Ed. 927, 120 A. L. R. 1466."

In the case of *United States* v. *County of Allegheny* (1944), 322 U. S. 174, 64 S. Ct. 908, 88 L. Ed. 1209, the Supreme Court held ineffective as against Mesta Machine Company the Pennsylvania statute increasing the assessed valuation of real estate to the extent of heavy machinery owned by the United States and installed for the purpose only of complying with a Government con-tract for large field guns, saying, in part (page 177): "In recent years this Court has curtailed sharply the doctrine of implied delegated immunity. But unshaken, rarely questioned, and indeed not questioned in this case, is the principle that possessions, institutions, and activities of the Federal Government itself in the absence of express congressional consent are not subject to any form of state taxation." It is to be noted that the rather hazy line of demarcation seems to be where the direct activities of the Federal Government end and where the independent activities of contractors supplying its needs begin. Mr. Justice Black and Mr. Justice Douglas concurred in the result, and Justices Roberts and Frankfurter dissented.

For an exhaustive annotation of these and many additional cases see the monograph to the *King* case in 140 A. L. R. 621.

The Supreme Court of the United States realizing, perhaps, that unsettled principles of taxation make for widely felt business instability, and that the principle laid down in the *Panhandle* case was too general and too broadly expressed, followed that decision by the *Dravo,*

the *King* and *Curry* cases. These cases were followed by *Penn Dairies, Inc.* v. *Milk Control Commission, supra,* and also by the *Mesta* case, which, we believe, is to be distinguished since it applies to an *ad valorem tax*. The present trend of decision may be due to the greatly expanding activities of the Federal Government, and not due to the Supreme Court's belief that the sovereign power of the different States was invaded by its former theory that supplying the physical needs of the Federal Government at a price is the exercise of a sovereign function.

It is true, with certain inconsequential exceptions, that all of the property used by the complainant in this case at the Naval Ordnance Plant is the property of the United States Government. It is also true that the property is used under a lease from the Federal Government granting the complainant a contractual right to use it in the performance of its own operations, not as an instrument of sovereignty but as a part of the activity of a person engaged in exercising its right to earn a profit in terms of money that it is not required to sacrifice at a critical time. No one, during the life of the lease, could lawfully deprive the complainant of the legitimate use of the plant, machinery and facilities. It could exercise the right of a tenant thereover, its right to possession being superior to that of the United States Government, its lessor.

It is argued for the complainant that, if this tax is upheld, in future contracts with the Government, the complainant being one of only three manufacturers of armor and deck plate in this country and this contract being a "lump sum" agreement, complainant will increase the cost to the Government by the amount of the occupational tax charged. Conceding the propriety of this contention, of course in order for future happenings to be considered as an element even in injunction matters they must constitute an immediate threat, and a matter of future policy, with optional courses of conduct open, is not so viewed. So far as what may be termed a monopolistic occupation not being subject to the keen competition that would prevent the taxpayer from passing on the

tax charged to its consumer, here the Government, we can only say that, to our minds, that is a principle that constituted an element considered by the Supreme Court of the United States under its former cases, but since then that Court has realized that the question of whether the taxpayer is going to absorb the tax in his price is too problematical to be considered.

In view of the foregoing, being of the opinion that the location of the complainant's plant upon land owned by the United States Government does not prevent the collection of a tax imposed by the State of West Virginia and that the manufacture of armor plate and deck plate under the circumstances alleged in the bill of complaint is not participation in the exercise of a sovereign function of the Federal Government in the absence of an Act of Congress so recognizing it, the decree of the Circuit Court of Kanawha County will be affirmed.

*Affirmed.*