# Davis v. Howard, Commissioner Of Revenue.

December 5, 1947.

Wm. B. Ardery, Judge.

Smith & Leary for appellant.

Eldon S. Dummit, Attorney General, and Roy House, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE REES—Affirming.

Emert L. Davis instituted this action against the Commissioner of Revenue of the Commonwealth of Kentucky alleging that an actual controversy existed between the parties, and seeking a declaration of rights. He alleged in his petition that as a licensee of the War Department of the United States he operated and maintained a motor transportation service solely within the military reservation at Camp Campbell, which lies partly within the territorial limits of Kentucky and partly within the territorial limits of Tennessee; that he pur-

chased gasoline for the operation of his motor vehicles from a licensed Kentucky dealer, and had paid under protest the 5c gasoline tax thereon; that the Commissioner of Revenue advised the dealer, in response to the protest, that he would hold the dealer liable for the tax on any gasoline sold to Davis. The plaintiff further alleged that he had informed the Commissioner of Revenue that he would buy his gasoline outside Kentucky and ship it direct to the military reservation for use in his motor vehicles, but the Commissioner, in response, notified him that he would be held liable for the tax on such gasoline. He then asked the court to declare the rights of the parties to be:

"(1) That defendant, as Commissioner of Revenue of the Commonwealth of Kentucky, has no jurisdiction to impose upon plaintiff the tax provided in KRS 138.220.

"(2) That the tax imposed by KRS 138.220 does not apply to gasoline purchased by plaintiff from a Kentucky dealer in gasoline when such gasoline is used by plaintiff in his motor transportation service solely within the Camp Campbell military reservation.

"(3) That the tax imposed by KRS 138.220 does not apply to gasoline purchased by plaintiff outside the Commonwealth of Kentucky, transported by tank car or motor truck directly to and within the Camp Campbell military reservation, and used solely within said military reservation by plaintiff in his said motor transportation service."

Rex A. Croft, doing business as the Monarch Oil Company, filed an intervening petition in which he alleged that he was a dealer in gasoline in Hopkinsville, Kentucky; that he sold gasoline to Emert L. Davis, and transported it from his bulk station in Hopkinsville by motor truck to Camp Campbell military reservation where it was placed in tanks owned by Emert L. Davis for use solely within the reservation. He asked the court to declare that the Commissioner of Revenue is without authority to collect from him the tax imposed by KRS 138.220. The circuit court decided all questions against the plaintiff and the intervenor, and declared the rights of the parties accordingly. Emert L. Davis has appealed.

Appellant first argues that the power to tax is an incident of sovereignty and since Kentucky has ceded sovereignty over the Camp Campbell military reservation to the Federal Government without reservation or qualification, the power to tax does not exist. The appellee's answer to this argument is that on October 9, 1940, the Congress passed Public Act No. 819, 54 Statutes 1059, 4 U. S. C. A. sec. 13 et seq., receding to the state sufficient sovereignty to collect the tax in question. This Act is commonly known as the ''Buck Act.'' It is entitled ''An Act to permit the States to extend their sales, use, and income taxes to persons residing or carrying on business, or to transactions occurring, in Federal areas, and for other purposes.'' Section 1(a) reads:

''No person shall be relieved from liability for payment of, collection of, or accounting for any sales or use tax levied by any State, or by any duly constituted taxing authority therein, having jurisdiction to levy such a tax, on the ground that the sale or use, with respect to which such tax is levied, occurred in whole or in part within a Federal area; and such State or taxing authority shall have full jurisdiction and power to levy and collect any such tax in any Federal area within such State to the same extent and with the same effect as though such area was not a Federal area.''

It is argued that the Buck Act does not undertake to confer sovereignty upon the state, but only an incident of sovereignty—the power to levy and collect certain taxes—and was not intended to apply where the state had ceded exclusive jurisdiction to the Federal Government. Undoubtedly, it was the purpose of the Congress to recede to the state sufficient sovereignty over Federal areas within its territorial limits to enable it to levy and collect taxes named in the Act. Otherwise the Act was a futile gesture. A state may reserve the right to impose taxes within its boundaries when it gives its consent to the acquisition of such areas by the Federal Government, or the Federal Government may refuse to accept exclusive jurisdiction, thus leaving the state with concurrent jurisdiction. James v. Dravo Contracting Company, 302 U. S. 134, 58 S. Ct. 208, 82 L. Ed. 155, 114 A. L. R. 318; Silas Ma-

son Company v. Tax Commission, 302 U. S. 186, 58 S. Ct. 233, 82 L. Ed. 187. If this is true, sovereignty, can be receded to the state by the Federal Government. The validity and effect of the Buck Act was under review in Kiker v. City of Philadelphia, 346 Pa. 624, 31 A. 2d 289, 293, certiorari denied, 320 U. S. 741, 64 S. Ct. 41, 88 L. Ed. 439. The Commonwealth of Pennsylvania had consented to the acquisition by the Federal Government of a tract of land in the city and county of Philadelphia known as League Island. Exclusive jurisdiction was ceded to the Federal Government with the proviso that all process of the Commonwealth of Pennsylvania should extend into, and be effectual within, the territory. Kiker, a resident of New Jersey, was employed at the League Island Navy Yard. The city of Philadelphia had adopted an ordinance imposing a tax on all salaries, wages, commissions and other compensation for work done or services performed in the city, and the question was whether Kiker was immune from the tax after the passage of the Buck Act. Section 2 of the Act provides that a state or any duly constituted taxing authority therein shall have full jurisdiction and power to levy and collect an income tax in .any Federal area within such state. The Supreme Court of Pennsylvania held that the Act restored sufficient sovereignty to the state to enable the city to collect the tax within the Federal reservation. The court said:

"It follows, therefore, that the Commonwealth of Pennsylvania, when it consented to the purchase of League Island by the National government and ceded jurisdiction over it, could have reserved to itself the right to tax in such area, even though the territory was acquired for use as a dockyard, just as a number of States have done under similar circumstances with respect to land within their respective geographical limits. There can be no logical objection on constitutional grounds if the same result is accomplished by a recession to the State of the right to tax, should Congress see fit by this means to promote local efficiency, as it appears to us to have done in passing Public Act No. 819. Similar retrocessions to the States of the Union are not unusual. While any cession, or recession, of jurisdiction by one sovereignty to another re-

quires an acceptance in order to render it effective (Yellowstone Park Transp. Co. v. Gallatin County, 9 Cir., 31 F. 2d 644), such acceptance will be presumed in the absence of a contrary intent."

The following from Collins v. Yosemite Park & Curry Company, 304 U. S. 518, 58 S. Ct. 1009, 1013, 82 L. Ed. 1502, was quoted with approval:

" 'The States of the Union and the National Government may make mutually satisfactory arrangements as to jurisdiction of territory within their borders and thus in a most effective way, cooperatively adjust problems flowing from our dual system of government.' "

In Carnegie-Illinois Steel Corporation v. Alderson, 127 W. Va. 807, 34 S. E. 2d 737, certiorari denied, 326 U. S. 764, 66 S. Ct. 146, 90 L. Ed. 440, the Supreme Court of Appeals of West Virginia followed the decision in the Kiker case. To the same effect are Bowers v. Oklahoma Tax Commission, D. C., 51 F. Supp. 652, and Falls City Brewing Company v. Reeves, D. C., 40 F. Supp. 35.

There can be no doubt that the Federal Congress by the Buck Act intended to and did recede to the state the jurisdiction and power to levy and collect taxes of the nature described in the Act. It is said that if the Buck Act was an effective recession of sovereignty, the Commonwealth of Kentucky declined to accept such recession by Chapter 173, Acts of 1944, KRS 3.010. The 1944 Act cannot be so interpreted when its history is examined. The original act ceding exclusive jurisdiction to the United States over Federal areas within the state was an act of 1892 carried in Carroll's Kentucky Statutes as section 2376. When the Kentucky Revised Statutes were adopted in 1942, section 2376 of Carroll's Kentucky Statutes appeared in the revision as section 3.010, but the phrase "in the manner prescribed by KRS 416.010 to 416.080" was inserted so that the section read:

"The Commonwealth of Kentucky consents to the acquisition by the United States of all lands and appurtenances in this state heretofore legally acquired, or that may be hereafter legally acquired by purchase, or by condemnation in the manner prescribed by KRS

416.010 to 416.080, for the erection of forts, magazines, arsenals, dock yards, post offices, custom houses, court-houses and other needful buildings, and for locks, dams and canals in improving the navigation of the rivers and waters within and on the borders of Kentucky.''

The Revision Commission discovered that it had been in error in adding this phrase, and a bill was prepared and presented to the General Assembly of 1944 correcting this and other errors in the 1942 edition of the Revised Statutes. Section 1 of Chapter 173 of the Acts of 1944 was a reenactment of section 3.010 of the Revised Statutes with the above quoted phrase omitted. It was stated in the title that the purpose of the Act was to perfect the Kentucky Revised Statutes by correcting certain errors therein.

It is next argued by appellant that the Buck Act permits a sales or use tax, but does not permit a tax such as is imposed by KRS 138.220. The pertinent part of that section reads: ''An excise tax of five cents per gallon shall be paid on all gasoline received in the state.'' Much is said about the difference between a ''sales or use tax'' and a tax on gasoline ''received'' in the state. The Buck Act defines the term ''sales or use tax'' as meaning, ''The term 'sales or use tax' means any tax levied on, with respect to, or measured by, sales, receipts from sales, purchases, storage, or use of tangible personal property, except a tax with respect to which the provisions of section 12 of this title are applicable.'' 4 U. S. C. A. sec. 18. KRS 138.-210 defines terms used in the Gasoline Tax Act. Subsection (5) reads in part:

'' 'Received,' as applied to gasoline, means when it has been imported into this state by any person for use, distribution, or delivery and sale and when it has been placed in tanks or other containers for use or subject to withdrawal for use, distribution or sale and delivery.''

When the legislative definitions contained in the Buck Act and our Gasoline Tax Act are considered, it will be seen that a tax on all the Gasoline received in this state comes within the term ''sales or use tax'' as defined in the Buck Act.

It is finally argued that Kentucky confers upon the taxpayer none of the benefits concomitant to a valid tax. The same argument was made in Kiker v. City of Philadelphia, supra, and it was pointed out, citing James v. Dravo Contracting Company, 302 U. S. 134, 58 S. Ct. 208, 82 L. Ed. 155, 114 A. L. R. 318, that when a state reserves to itself the power to tax in an area within its geographical limits when ceding jurisdiction to the National Government over such territory, the obligation of furnishing protection and benefits to the persons and property within the confines of the ceded area impliedly remains. It was held that there was no constitutional objection to the Federal Governments' receding to a state a portion of the exclusive jurisdiction previously obtained from it together with the incident obligations which were impliedly transferred by the recession. The court said:

"The fact that the Federal government, as far as League Island is concerned, does not at this time see fit to take full advantage of the obligation of this Commonwealth, or its political subdivision, the City of Philadelphia, to make available protection and benefits to persons and property on the Island, does not justify our invalidation of the income tax in question, as far as plaintiff and those in a similar position are concerned."

We conclude that the circuit court correctly declared the rights of the parties, and the judgment is affirmed.