OFFUTT HOUSING COMPANY, A CORPORATION, APPELLEE, V.
COUNTY OF SARPY ET AL., APPELLANTS.
70 N. W. 2d 382

Filed May 6, 1955. No. 33658.

*Orville Entenman,* for appellants.

*Charles S. Reed* and *Franklyn K. Norris,* for appellee.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

CHAPPELL, J.

Plaintiff, Offutt. Housing Company, a corporation, brought this action against defendants, County of Sarpy and Robert M. Eby, its county treasurer, seeking a declaratory judgment determining that a 1952 tax levy and assessment made by the county upon plaintiff's personal property located within the Offutt Air Force Base was void; to enjoin collection thereof; and to permanently enjoin any levy and assessment of taxes thereon. After trial upon the merits, a judgment was rendered which found and adjudged the issues generally in favor of plaintiff and against defendants, and awarded the relief sought by plaintiff. Defendants' motion for new trial was overruled and they appealed. Numerous errors were assigned, the effect of which was to assert that the judgment was not sustained by the evidence but was contrary thereto and contrary to law. We sustain the assignments.

At the outset we are met with defendants' contention that by reason of section 77-1727, R. R. S. 1943, plaintiff could not maintain injunction. In Hemple v. City of Hastings, 79 Neb. 723, 113 N. W. 187, it is said, after referring to cited cases and such section: "It was settled that, where a tax is void, i.e., where there is no tax which the plaintiff is in equity bound to pay, he may invoke the aid of a court of equity to protect his rights

by injunction, notwithstanding such provision. Earl v. Duras, 13 Neb. 234; Burlington & M. R. R. Co. v. Cass County, 16 Neb. 136; Touzalin v. City of Omaha, 25 Neb. 817; Bellevue Improvement Co. v. Village of Bellevue, 39 Neb. 876." Other comparable Nebraska cases too numerous to cite here are cited and comprehensively discussed in Mid-Continent Airlines v. Nebraska State Board of Equalization & Assessment, 105 F. Supp. 188. As indicated therein, this court has uniformly upheld the right to enjoin taxes which are demonstrably void for want of jurisdiction or authority to impose the same, as distinguished from those which are not void but simply irregular or erroneous. We conclude that the remedy of injunction is available, provided the evidence and applicable law warrants its employment.

Relying solely upon section 25-21,159, R. R. S. 1943, defendants also argued that the state was a necessary party defendant, thus there was a defect of parties. We conclude that the contention has no merit. No claim is made in this case that any statute is unconstitutional, requiring opportunity for the Attorney General to be heard. As stated in Northwestern Mutual Life Ins. Co. v. Nordhues, 129 Neb. 379, 261 N. W. 687: "Section 22, art. V of the Constitution, provides: 'The state may sue and be sued, and the legislature shall provide by law in what manner and in what courts suits shall be brought.' Under this provision no suit can ordinarily be maintained unless authorized by legislative provision. The state cannot be sued in its own courts without its consent. State v. Mortensen, 69 Neb. 376; McShane v. Murray, 106 Neb. 512; McNeel v. State, 120 Neb. 674; Eidenmiller v. State, 120 Neb. 430."

Section 24-319, R. R. S. 1943, waived that prerogative in some respects, but this action does not come within its purview. It has been held that: "Generally, an action for a declaratory judgment cannot be maintained against the state without its consent, the state's immunity from suit being held unaffected by declaratory judgment

statutes; but such an action may be maintained under statutes permitting various actions against the state." 81 C. J. S., States, § 214, p. 1304, and authorities cited. It has also been held that: "Ordinarily, general rules as to proper and necessary parties in civil actions apply in taxpayers' suits." 20 C. J. S., Counties, § 291, p. 1244.

On the other hand, as provided in section 23-101, R. R. S. 1943: "Each county, established in this state * * * shall be a body politic and corporate * * * and by that name may sue and be sued, plead and shall be impleaded, defend and be defended against, in any court having jurisdiction of the subject matter, either in law or equity, or other place where justice shall be administered." No exception thereto is operative herein. This court has uniformly entertained jurisdiction in cases brought to enjoin the collection of void taxes wherein only the county in which the property is located and the county treasurer thereof have been made parties defendant. Rothwell v. Knox County, 62 Neb. 50, 86 N. W. 903; Y. M. C. A. of Omaha v. Douglas County, 60 Neb. 642, 83 N. W. 924, 52 L. R. A. 123. See, also, 28 Am. Jur., Injunctions, § 275, p. 450.

In 1949 Congress enacted Chapter 403, Public Law 211, generally referred to as the Wherry Housing Act. As amended, it now appears as Title 12, U. S. C. A., sections 1748 to 1748i. The primary purpose of the legislation was to procure the construction, operation, and maintenance by private industry of adequate housing facilities for rental to civilian and military personnel of the army, navy, and air force. The main impetus for such construction was supplied by provisions of the act which authorize the Federal Housing Commissioner, after appropriate certification of necessity as a permanent part of a military establishment with no intention to substantially curtail activities thereat, to insure a first mortgage on real estate in fee simple or on a leasehold for an amount generally not to exceed five million dollars, and not to exceed 90 percent of the replacement

cost of the property or project when completed.

Section 1748d, insofar as important here, provides that: "Whenever the Secretary of the * * * Air Force determines that it is desirable to lease real property within the meaning of sections 626s-3 to 626s-6 of Title 5, * * * to effectuate the purposes of this subchapter, the Secretary concerned is authorized to lease such property under the authority of sections 626s-3 to 626s-6 of Title 5, * * * upon such terms and conditions as in his opinion will best serve the national interest without regard to the limitations imposed by said sections in respect to the term or duration of the lease, and the power vested in the Secretary of the Department concerned to revoke any lease made pursuant to said sections in the event of a national emergency declared by the President shall not apply. Whenever the Secretary of the * * * Air Force determines it to be in the interest of national defense, he is authorized to sell, transfer, and convey at fair value (as determined by him), for use under this subchapter, all or any right, title, and interest in any real property under his jurisdiction, *notwithstanding any limitations or requirements of law with respect to the use or disposition of such property. The authority conferred by this section shall be in addition to and not in derogation of any other power or authority of the Secretary of the * * * Air Force.*" (Italics supplied.)

In that connection, section 1748f, also provides: "Nothing in this subchapter shall be construed to exempt any real property acquired and held by the Commissioner under this title from taxation by any State or political subdivision thereof, to the same extent, according to its value, as other real property is taxed." Such section is not controlling under the factual situation presented in the case at bar, but it does have application, to be considered as a circumstance in connection with others, indicating the intent of Congress that such housing projects should in any event bear their just proportion of state and local taxation.

Further, however, section 626s-6 of Title 5, specifically referred to and incorporated in Title 12, section 1748d, provides: "The lessee's interest, made or created pursuant to the provisions of sections 626s-3 to 626s-6 of this title, shall be made subject to State or local taxation. Any lease of property authorized under the provisions of said sections shall contain a provision that if and to the extent that such property is made taxable by State and local governments by Act of Congress, in such event the terms of such lease shall be renegotiated." The first sentence of such section specifically makes lessee's interest subject to state and local taxation. However, the latter sentence has application only in the event that Congress should subsequently consent to taxation of the interest of the government in addition to the interest of the lessee. In that connection, as stated in Meade Heights v. Tax Commission of Maryland, 202 Md. 20, 95 A. 2d 280: "As we read this provision, it called for renegotiation only in the event that Congress should consent to taxation of the government's interest in addition to that of the lessee, which is recognized as fully taxable as of the date of execution." As hereinafter observed, section 8 of plaintiff's lease involved herein so recognized that construction.

Only plaintiff lessee's interest in the housing project, together with the fixtures thereof and its personal property used therein, is involved in this case. In other words, contrary to plaintiff's contention, this is not a case where the county has attempted to tax government property, but rather has taxed plaintiff's private property located on an air force base wherein, as heretofore and hereinafter observed, the right to do so was specifically re-ceded by the Congress of the United States.

The facts are not in dispute. Plaintiff is a perpetual private Nebraska corporation, organized December 22, 1950, by one Carl C. Wilson and two other persons living in Omaha. Its authorized capital stock was $800,000, consisting of 80,000 shares, having a par value of $10 per

share. Ten such shares were designated as "Preferred Stock." The rest was "Common Stock." Its principal place of business was designated as in Omaha. The general nature of its business was to provide housing for rent or sale, to acquire any real estate or interest or right therein, or appurtenances thereto, and any and all personal property in connection therewith; to improve, operate, and sell, convey, assign, mortgage, or lease any real estate and personal property; to borrow money and issue evidence of indebtedness in furtherance of any and all the objects of its business, and to secure same by mortgage, deed of trust, pledge, or other lien; and "To apply for and obtain or cause to be obtained from the Federal Housing Commissioner a contract or contracts of mortgage insurance pursuant to the provisions of the National Housing Act as amended, covering bonds, notes and other evidences of indebtedness issued by this corporation and any indenture of mortgage or deed of trust securing the same. So long as any property of this corporation is encumbered by a mortgage or deed of trust insured by the Federal Housing Commissioner it shall engage in no business other than the construction and operation of a Rental Housing Project or projects."

Carl C. Wilson is president of plaintiff corporation. He is also president of another private corporation, called "Carl C. Wilson, Inc." The latter corporation was selected as the building or construction contractor. It constructed the 611 modern housing units here involved for plaintiff corporation, and was compensated therefor by it. The Federal Housing Administration's amended Project Analysis, dated January 24, 1951, estimated that compensation required to be paid the building corporation for such construction would be $285,750. It estimated that plaintiff's net annual income from rentals, with 97 percent occupancy, after payment of maintenance, operating expenses, and taxes, would be $326,798. It estimated that the maximum insurable mortgage on

plaintiff's interest in the project should be $4,949,100. In conformity with the Wherry Housing Act, the Secretary of the Air Force certified that the average monthly rental charged and collected by plaintiff should be and was $71.04 per unit, which at 100 percent occupancy would gross $520,865.28 per year.

On January 18, 1951, the Secretary of the Air Force and plaintiff corporation entered into a lease whereby plaintiff was leased some 63 acres of described land on Offutt Air Force Base for a period of 75 years at $100 a year, "to be used for the purpose of erecting, maintaining and operating a housing project, consisting of approximately 611 units, substantially in accordance with the outline plans and specifications submitted to the Department of the Air Force and in accordance with the detailed plans and specifications to be approved by the Federal Housing Commissioner * * *." Forty-eight acres of such described land had been previously deeded to the United States by the Omaha Chamber of Commerce and the Air Force had appropriately taken exclusive jurisdiction thereof.

The lease required: "That an application for mortgage insurance under Title VIII of the National Housing Act, as amended, for the said housing project, including Exhibits required therein, shall be submitted to the Federal Housing Administration within forty-five (45) days from the effective date of this lease. * * * That the Lessee shall lease all units of the housing project to such military and civilian personnel of the Army, Navy, Marine Corps or Air Force (including Government Contractors' employees) assigned to duty at the military installation or in the area where such property is located, as are designated by the Commanding Officer, OFFUTT AIR FORCE BASE, OMAHA, NEBRASKA; provided, however, that" under certain circumstances and conditions, the lessee might lease such unit or units to persons other than such military or civilian personnel if their leases were limited to a term of 1 year with pro-

vision for an automatic renewal thereafter from month to month.

Section 8 of the lease specifically provides: "That the Lessee shall pay to the proper authority, when and as the same become due and payable, all taxes, assessments, and similar charges which, at any time during the term of this lease, may be taxed, assessed or imposed upon the Government or upon the Lessee with respect to or upon the leased premises. In the event any taxes, assessments, or similar charges are imposed with the consent of the Congress of the United States *upon the property owned by the Government and included in this lease (as opposed to the leasehold interest of the Lessee therein), this lease shall be renegotiated* so as to accomplish an equitable reduction in the rental provided above, which shall not be greater than the difference between the Amount of such taxes, assessments, or similar charges and the amount of any taxes, assessments or similar charges which were imposed upon such Lessee with respect to his leasehold interest in the leased premises prior to the granting of such consent by the Congress of the United States; * * *." (Italics supplied.)

Plaintiff was required to comply with all applicable laws; to keep the buildings and improvements in good order, condition, and repair, and save the government harmless from failure in that respect; to keep them insured against fire in an amount determinable by the government but at its own expense, with loss payable to lessee and any security holder jointly as their interest may appear; and in the event of any partial loss or damage to the improvements, lessee was required within a reasonable time to restore them to their former condition. Plaintiff also had the right to permit utility companies to extend water, sewer, gas, telephone, and electric power lines on the premises for the exclusive purpose of furnishing utilities to the housing project.

Thereafter, on February 1, 1951, plaintiff, as mortgagor, mortgaged its "described leasehold situated in the

of        , County of Sarpy, and State of Nebraska, to wit: all right, title, interest and privileges of the mortgagor in and to that certain ground Lease between the SECRETARY OF THE AIR FORCE representing the UNITED STATES OF AMERICA, and Mortgagor, dated January 18, 1951 * * * Together with the privileges and appurtenances to the same belonging, and all of the rents, issues, and profits which may arise or be had therefrom; and * * * all buildings and improvements of every kind and description now or hereafter erected, or placed thereon," including all fixtures of every described kind "together with all building materials and equipment now or hereafter delivered to said premises and intended to be installed therein" and "All articles of personal property owned by the Mortgagor and now or hereafter attached to or used in and about the building or buildings now erected or hereafter to be erected on the lands herein described" all of which property was deemed fixtures to the extent permitted by law. The mortgagee was Manufacturers Trust Company of New York. The principal of the mortgage was $4,949,100, with interest at 4 percent per annum, upon the unpaid balance until paid by monthly installments of $22,683.37, all according to the terms of a promissory note of even date. In addition thereto, plaintiff agreed to pay monthly to the mortgagee a sum sufficient to prevent delinquency of premium charges under the contract of mortgage insurance with the Federal Housing Commissioner, together with ground rentals, tax assessments, water rents, fire, and other hazard insurance premiums. Plaintiff also agreed to pay all taxes levied on the mortgagee's interest in the improvements and upon the mortgage or debt secured thereby, excluding any income tax, state or federal, imposed on the mortgagee.

Plaintiff was required to keep the improvements and equipment then existing or thereafter erected, insured against loss by fire or other hazards, in an amount equal to not less than 80 percent of the actual cash value there-

of, with loss payable to mortgagee and the Federal Housing Commissioner as their interests may appear. The mortgage also provided that any amount paid for loss should, to the extent of indebtedness unpaid, be paid to the mortgagee and at its option such may be applied on the debt or released for repairing or rebuilding the premises.

Plaintiff further agreed to commit or suffer no waste of the property and keep same in good condition and repair, and in all respects conform to and comply with the covenants, provisions, terms, conditions, and agreements of the valid ground lease executed January 18, 1951, then in full force and effect. Many other provisions, terms, and conditions upon which the right of forfeiture or default might depend appear in the mortgage, but they are of no importance here. The mortgage was duly insured by the Federal Housing Administration, and the 611 modern housing units, equipped as covered by the mortgage, were constructed, with 78 percent of them completed by March 10, 1952, and all of them by about June 6, 1952. Concededly, the buildings and improvements have a useful life expectancy of only about 35 years.

On April 11, 1952, the Attorney General of this state rendered an opinion that plaintiff's interest in the project, including all of the personal property used therein, was taxable as personal property. Report of Attorney General, 1951-1952, p. 486. Nevertheless, plaintiff filed no tax return, and on June 23, 1952, the county assessor of Sarpy County prepared and filed a "Business 1952 Schedule," for plaintiff corporation in which he listed "Furniture & Fixtures - Tools & Equipment $205 * * * Household Appliances $69,695 * * * Improvements on Leased Land $755,785." The total was listed as "Apartment Houses $825,685." The property is not located in any municipality or school district, thus there was a state and county tax levy and assessment of $10,783.45,

no part of which tax was ever paid by plaintiff after due notice thereof.

In that connection, section 4 of the Enabling Act provides in part: "* * * that no taxes shall be imposed by said state on lands or property therein belonging to or which may hereafter be purchased by the United States." Volume 2, R. R. S. 1943, p. 7. Section 72-601, R. R. S. 1943, provides in part: "The consent of the State of Nebraska is granted to the United States of America * * * for the purchase by the United States of such other lands within the State of Nebraska as the agents or authorities of the United States may from time to time select for the erection of forts, magazines, arsenals and other needful buildings." Section 72-602, R. R. S. 1943, provides: "The jurisdiction of the State of Nebraska in and over the lands mentioned in section 72-601 shall be ceded to the United States; Provided, the jurisdiction ceded shall continue no longer than the United States shall own or occupy such lands." Section 72-604, R. R. S. 1943, provides: "The jurisdiction ceded shall not vest until the United States shall have acquired the title to such lands by purchase or grant. So long as the lands shall remain the property of the United States, when acquired as provided in section 72-601, and no longer, they shall be exempt from all taxes, assessments, and other charges which may be levied or imposed under the authority of the laws of this state."

Article I, section 8, Constitution of the United States, gives Congress exclusive legislative authority over all such places purchased by consent of the Legislature of the state, and gives it authority "To make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof."

Thus, if Congress by its legislative acts heretofore set forth consented to the occupation of its lands by lessee and the taxation of lessee's interest in the project erected

thereon, then, in that respect, any immunity or exemption thereof from taxation appearing in the Enabling Act and ceding statutes of this state was waived. In other words, the right to tax lessee's interest in the housing project located on the air base was re-ceded to the State of Nebraska. Board of County Commissioners v. United States, 105 F. Supp. 995. Such case is also comparable in principle with that at bar and supports the right to tax plaintiff's interest here involved.

Article VIII, section 1, Constitution of Nebraska, provides in part: "The necessary revenue of the state and its governmental subdivisions shall be raised by taxation in such manner as the Legislature may direct; but taxes shall be levied by valuation uniformly and proportionately upon all tangible property and franchises, and taxes uniform as to class may be levied by valuation upon all other property." Section 2 provides in part: "The property of the state and its governmental subdivisions shall be exempt from taxation. * * * No property shall be exempt from taxation except as provided in this section." In that connection, plaintiff's interest here involved is not constitutionally exempt from taxation.

Further, our revenue and taxation statutes are controlling. Section 77-102, R. R. S. 1943, provides: "The word 'property' includes every kind of property, tangible or intangible, subject to ownership." Section 77-104, R. R. S. 1943, provides: "The term 'personal property' includes all property other than real property and franchises." Section 77-201, R. R. S. 1943, provides: "All property in this state, not expressly exempt therefrom, shall be subject to taxation, and shall be valued and assessed at its actual value." (Such statute was amended, effective March 6, 1953, to provide that all such property should be valued at its actual value, but shall be assessed at fifty percent of its actual value.) Section 77-1201, R. R. S. 1943, provides in part: "A complete list of all personal property held or owned on March 10 of the year in which the assessment is being made,

except motor vehicles, shall be made as follows: (1) Every person of full age and sound mind, being a resident of this state, shall list * * * all other personal property, * * *." Section 77-1229, R. R. S. 1943, provides: "Every person required to list property shall make out and verify by his oath a statement of all personal property which he is required to list, either as owner, lessee or occupant in control thereof * * * upon the blanks prescribed by the State Tax Commissioner. Such blanks shall be delivered to each taxpayer by the county assessor or his assistants for that purpose, and when so made out shall be verified by each person before the county assessor, his assistants, a notary public, or some other person authorized by law to take acknowledgments, and be delivered to the county assessor or county clerk as ex officio county assessor on or before April 20 of each year."

This court in Ashby v. Peters, 124 Neb. 131, 245 N. W. 408, next reported 128 Neb. 338, 258 N. W. 639, 99 A. L. R. 843, held that: "Save for the purposes of conveyancing, a lease of more than one year is not real estate." See, also, Paul v. Cameron, 127 Neb. 510, 256 N. W. 11. Generally, a leasehold for a term of years is a chattel real, falling within the classification of personal property. 51 C. J. S., Landlord and Tenant, § 26, p. 531. For all practical purposes, it may be the equivalent of absolute ownership. 51 C. J. S., Landlord and Tenant, § 202, p. 809. In that connection, section 77-1209, R. R. S. 1943, specifically applicable here, provides: "All improvements put on leased public lands shall be assessed to the owner of such improvements as personal property, together with the value of the lease, and listed and assessed as such in the place where the land is situated. The taxes imposed on such improvements shall be collected by levy and sale of the interest of such owner, the same as in all other cases of collection of taxes on personal property, or by suit in the name of the county against such owner."

For taxation purposes, what is meant by public lands, as used in section 77-1209, R. R. S. 1943? In Union Pacific Ry. Co. v. Karges, 169 F. 459, quoting from Northern Lumber Co. v. O'Brien, 139 F. 614, 71 C. C. A. 598, it is said: " 'The words "public land" have long had a settled meaning in the legislation of Congress, and, when a different intention is not clearly expressed, are used to designate such land as is subject to sale or other disposal under general laws, but not such as is reserved by competent authority for any purpose or in any manner, although no exception of it is made. (Numerous cases cited.)' " However, thereafter the court said: "These decisions do not conflict with the settled doctrine that, where it clearly appears from the statute that the term 'public lands' is intended to include lands which have theretofore been reserved by Congress for a specific purpose, such intention will prevail, as it is a fundamental rule of construction that a legislative act is to be interpreted according to the plain intention of the legislative body." See, also, Dugan v. Montoya, 24 N. M. 102, 173 P. 118; United States v. Bisel, 8 Mont. 20, 19 P. 251; United States v. Blendaur, 128 F. 910.

Cotulla v. Laxson, 60 Tex. 443, involved a penal statute which made it an offense for any person who was an officer or clerk in the general land office, or a county surveyor or his deputy, to directly or indirectly be concerned in the purchase of any right, title, or interest in any public lands. In that opinion it is said: "That the term 'public land,' as used in that article, is not limited in its signification to unappropriated public domain, but also includes what is usually designated as public school lands, it seems to us admits of no question. These public school lands were set apart for a public purpose, devoted to the promotion of public education. The act of appropriation, or, rather, the dedication of these lands to that purpose, did not work a change in their ownership; true they were not thereafter unappropri-

ated public domain, but as ever belonged to the public."

In DeShazo v. Eubank (Tex. Com. App.), 222 S. W. 976, involving a comparable situation, it is said, referring to public lands: "The sense in which the term is used may vary somewhat in the different statutes, and it should be given such meaning as will effectuate the intention of the Legislature in its use." The opinion thereafter cited and quoted with approval from Cotulla v. Laxson, *supra.*

As stated in 73 C. J. S., Public Lands, § 1, p. 647: "The meaning of the words 'public lands,' may vary somewhat, however, in different statutes passed for different purposes, and they should be given such meaning in each as comports with the intention of the legislature in their use." See, also, State ex rel. Sioux County v. Tucker, 38 Neb. 56, 56 N. W. 718.

We believe our Legislature intended that the term "leased public lands" as used in section 77-1209, R. R. S. 1943, for taxation purposes, should and does mean "lands belonging to the public, which have been leased as authorized by law."

Plaintiff's lease provided that upon its expiration or earlier termination, all improvements made upon the leased premises should, with exceptions unimportant here, remain the property of the government without compensation. It also provided that the buildings and improvements erected by the lessee constituting the housing project should be and become as completed real estate and part of the leased land and public buildings of the United States, leased to lessee for the purpose of serving the governmental and public purpose of military housing in accordance with Title VIII of the National Housing Act, and in accordance with the provisions of the lease and subject to the term of the lease and any renewal or extension of the same. As we view it, the first sentence aforesaid simply provided when and in what manner plaintiff's interest would ultimately become the government's property, while the second

sentence simply prevented plaintiff from destroying the mortgage security insured by the government and from defeating the purpose of the housing project by removing any of the buildings or improvements from the leased land and assured plaintiff's performance of the terms and conditions of the mortgage and lease. The language used therein did serve to retain the bare legal title in the government for a nominal consideration of $100 per year, but it did not in any manner deprive plaintiff of the ownership of its interest as lessee, which for all intents and purposes was the actual value of all the buildings and improvements, together with the fixtures thereof and all personal property used therein on the leased land so long as its lease was in force and effect. In Ken Realty Co. v. Johnson, 138 F. 2d 809, it is pointed out that: "But when a separate interest in a piece of property is exempt, or its owner is immune from taxation, the several separate interests must be recognized" for tax purposes.

In that regard, plaintiff's lease was for a period of 75 years, which was 5 years longer than 3 score and 10, the conventional life of ordinary men. It was for a period so long that plaintiff would have dominion or control and could profitably use and consume the entire useful life of two complete generations of housing units, each having a useful expectancy of 35 years, with 5 years still remaining for unexpected longevity. Also, in conformity with federal laws, plaintiff mortgaged its interest as owner thereof for $4,949,100, the estimated replacement cost of which was $5,449,490, and the Federal Housing Commissioner duly insured the mortgage. In addition, plaintiff corporation entered into and filed conditional sales contracts and chattel mortgages covering furniture, appliances, and equipment used in the housing project, the consideration for which totalled $110,033.97. Further, on July 28, 1953, Carl C. Wilson, both as president of plaintiff corporation and as president of Carl C. Wilson, Inc., duly signed

and acknowledged the execution of a limited assignment of Offutt housing project rentals to the Douglas County Bank of Omaha for the business purposes and advantage of both corporations. Therein it was represented in part that Offutt Housing Corporation was the owner of 611 housing units located at Offutt Field, Sarpy County, Nebraska. As a witness in this case, Carl C. Wilson also conceded that the improvements had only a life expectancy of about 35 years, "that any building that was seventy-five years old was not worth maintaining any farther than that," and that plaintiff was entitled to the possession and use together with all income and profits therefrom, for 75 years at a rental of only $100 a year.

We therefore conclude that for purposes of taxation under the provisions of section 77-1209, R. R. S. 1943, plaintiff was in fact and as a matter of law the owner of all the improvements, including the fixtures, appliances, equipment, furniture, and other personal property used therein, so long as his lease was in force and effect, all of which was taxable as personal property. To conclude otherwise would permit plaintiff to perpetrate a sham and fraud upon the state and its governmental subdivisions.

The following authorities support the foregoing conclusions. Baltimore Shipbuilding & Dry Dock Co. v. Mayor of Baltimore, 97 Md. 97, 54 A. 623, affirmed in 195 U. S. 375, 25 S. Ct. 50, 49 L. Ed. 242, quoted with approval from North Pacific R. R. Co. v. Patterson, 154 U. S. 130, 14 S. Ct. 977, 38 L. Ed. 934, and Wisconsin R. R. Co. v. Price County, 133 U. S. 496, 10 S. Ct. 341, 33 L. Ed. 687, wherein it is said: " 'that he who has the right to property, and is not excluded from its enjoyment, shall not be permitted to use the legal title of the government to avoid his just share of State taxation.' "

The opinion in Meade Heights v. Tax Commission of Maryland, *supra,* disposed of five cases involving the

same taxation principles, wherein three private corporations had leased from the United States five separate parcels of land located upon military reservations over which the federal government had exclusive jurisdiction. They severally constructed housing units thereon under authority of the federal housing statutes heretofore cited and discussed. The corporations had appealed from a tax assessment upon their interest in the buildings at full value thereof, and the court affirmed. The situation in such cases was in all material respects identical with that at bar except the particular applicable state statutes and two provisions of the lease, which could not change the ultimate result herein. In that regard, the lease of Meade Heights, Inc., was of 28½ acres at Fort Meade for 75 years, at a ground rental of $720 per annum, with a provision that title to all improvements erected should remain in lessee with a right of removal at termination, if it so elected. If it did not so elect, they would become property of the government, without compensation to lessee. In that opinion, it is said: "Coming to the main point, it is perfectly clear that, in the absence of congressional consent, express or implied, a State cannot impose a direct tax upon property owned by the federal government or held for it. (Citing cases.) But it is equally clear that private interests in government property are taxable to their full value. (Citing cases.) In the instant case, Congress has definitely consented to the taxation of the lessee's interest, whatever that may be. It can only complain if, in fact, its reserved interest is subject to taxation. * *. * The assessment before us is against the lessee, and purports to reach the full value of the buildings in its hands. The government cannot complain if the tax, otherwise sustainable, increases government costs by its economic incidence. James v. Dravo Contracting Co., 302 U. S. 134, 58 S. Ct. 208, 82 L. Ed. 155; Alabama v. King & Boozer, 314 U. S. 1, 62 S. Ct. 43, 86 L. Ed. 3."

Gay v. Jemison (Fla.), 52 So. 2d 137, also involved the same taxation principles, but from a somewhat different statutory angle. In such case, the comptroller appealed from a decree in favor of plaintiff enjoining the collection of taxes on materials to be used in construction of 450 housing units on similar land·leased by a private corporation from the United States. As hereinafter observed, the lease was·in all material respects identical with that here involved. The court in that opinion dismissed plaintiff's bill of complaint, saying: "Comparing the probable useful life of the buildings with the time for which the lease is to extend, the question immediately arises in one's mind whether the useful life of the buildings will not have ended by the time the lease expires. We have already said also that the buildings are for the 'primary' use of military personnel. It may be assumed that this is the chief purpose of the installation; however, the lease contains the statement that the property may be occupied by civilian as well as military personnel of the army, marine corps, and air force; and, further, that upon failure of the commanding officer of the field to designate persons of those classifications to tenant any units within a certain length of time after they become vacant, the lessee may then rent to parties who do not fall in any of these categories.

"It is an obligation of the lessee to comply with all ordinances with reference to licenses and permits to do business and it is its privilege to engage public utility companies to provide water, fuel, telephone service, and electric power for the use of the occupants of the units. The lessee is bound to maintain the property in a state of good repair and to save the government harmless against all actions and suits springing from any failure in this respect.

"The lessee is required at its own cost to insure the buildings and to restore any of them damaged by fire, but if a building is wholly destroyed, then the lessee has

the right to determine that the building shall not be reproduced.

"The lessee must pay 'all taxes, assessments, and similar charges which, at any time during the term of (the) lease, may be taxed, assessed or imposed upon the Government or upon the Lessee with respect to or upon the leased premises.'

"The bare title of the property, of course, remains in the United States Government, and for its use the government receives but $100 a year.

"Bearing in mind what we consider the evident intent of the Congress of the United States, and construing the language of the contract between the Government of the United States and the lessee, we cannot arrive at the chancellor's conclusion that this housing project when completed will be a public work owned by the United States Government.

"It is true that the government, through its military, retains a certain supervision over the area where the project is located and has a preference with reference to accommodations for its personnel, but taken as a whole, the arrangement is in reality one affording a source of income to the lessee, and we think it is obvious that any money withheld from the state by applying the exemption would not benefit the national exchequer but would reach the pockets of private citizens. The corporation borrows the money, takes the risks, bears the cost of maintenance and insurance, receives the income from rentals, and in case of total destruction of a building by fire, keeps, if it chooses, the money paid by the insurance company to cover the loss. The corporation must pay the debt it incurs to finance the installation, and certainly any profit for a period of seventy-five years belongs to it. Meanwhile as a part of its expenses there is the nominal payment of $100 a year to the government as lessor.

"We believe the Comptroller's position is correct and that the materials furnished by the contractor will not

become a part of a government work but of buildings of a private enterprise, and therefore are subject to state tax."

Tampa Bay Garden Apartments v. Gay (Fla.), 55 So. 2d 739, also involved the same taxation principles from a somewhat different statutory angle. In such case the private corporation appealed from a decree dismissing its bill of complaint and requiring it to secure a certificate of registration and collect a 3 percent sales tax from occupants of the housing units. In the opinion, after citing Gay v. Jemison, *supra,* with approval, the court affirmed the judgment, saying: "We find nothing in these cases or in the language of the pertinent legislative acts that show any purpose whatever to release the jurisdiction of the State over the lands in question so as to prohibit it from imposing the required three per cent sales tax on the housing project."

Davis v. Howard, 306 Ky. 149, 206 S. W. 2d 467, also involved the same taxation principles from a somewhat different statutory angle. In the opinion it was said: "Undoubtedly, it was the purpose of the Congress to recede to the state sufficient sovereignty over Federal areas within its territorial limits to enable it to levy and collect taxes named in the Act. Otherwise the Act was a futile gesture." See, also, Kiker v. Philadelphia, 346 Pa. 624, 31 A. 2d 289, certiorari denied 320 U. S. 741, 64 S. Ct. 41, 88 L. Ed. 439; Bowers v. Oklahoma Tax Commission, 51 F. Supp. 652.

For reasons heretofore stated, we conclude that plaintiff's interest in the housing units and fixtures as owner thereof was and is taxable as personal property, together with the value of plaintiff's lease, as provided by section 77-1209, R. R. S. 1943. All other personal property belonging to plaintiff corporation and located and used by it in the project by virtue of plaintiff lessee's interest is a part thereof, and could acquire no greater rights of exemption. Accordingly, it was and is also subject to state and local taxation in the same manner as other

personal property in Sarpy County. In such a situation, it is elementary that injunction was not available to plaintiff and should have been denied.

The judgment of the trial court should be and hereby is reversed and the cause is remanded with directions to render judgment against plaintiff and for defendants in conformity with this opinion. All costs are taxed to plaintiff.

REVERSED AND REMANDED WITH DIRECTIONS.