PUERTO RICO DRYDOCK & MARINE TERMINALS, INC., Plaintiff and Respondent, *v.* SECRETARY OF THE TREASURY OF PUERTO RICO, Defendant and Appellant.

No. 12006.    Submitted March 28, 1960.—Decided May 17, 1961.

*J. B. Fernández Badillo,* Secretary of Justice, *Arturo Estrella,* Assistant Secretary of Justice and *Manuel J. Medina Aymat* and *Carlos N. Souffront,* Assistant Attorneys General, for appellant. *Fiddler, González, Faure & Guillermard* for respondent. *James R. Beverley, R. Castro Fernández* and *Francisco Castro Amy* as amici curiae.

MR. JUSTICE PÉREZ PIMENTEL delivered the opinion of the Court.

Act No. 77 of May 1, 1941 (Sess. Laws, p. 670) authorized the Governor and the Commissioner of the Interior of Puerto Rico to sell to the United States Government for national-defense purposes, a dry dock and the lands wherein the same is constructed.

In order to facilitate said sale and upon agreement between the United States Navy Department and the Commissioner of the Interior of Puerto Rico, the Government of the United States condemned said property and acquired and accepted the exclusive jurisdiction thereon upon taking possession thereof in the year 1941.

Once the national emergency had ended, the Navy Department leased the afore-mentioned property to Abarca Dry Dock Corporation.[1] Said corporation has been engaged from the time of its organization in the business of repairing sea vessels, to maritime services in the operation of a floating dock and a dry dock, and to the services of loading and unloading cargo within the property leased to the United States Government.

---

[1] Afterwards, this Corporation changed its name to "Puerto Rico Dry Dock and Marine Terminals," which now appears as the plaintiff-respondent.

On January 1, 1952 the lessee was the owner of certain personal property consisting of cash on hand, materials and goods, furniture and fixtures, vessels, machinery and equipment for loading and unloading cargo. All of said property was situated within the lands belonging to the Government of the United States and which had been leased to the Abarca Dry Dock Corporation.

On June 15, 1953, the Secretary of the Treasury notified the lessee corporation of a tax assessment for the fiscal year 1952–53 on the personal property previously described.

The taxpayer appealed to the Superior Court challenging the validity of said assessment on the ground that the property on which the tax was sought to be levied was totally situated outside the tax jurisdiction of the Commonwealth of Puerto Rico, since it was located on land leased by the People of Puerto Rico to the Government of the United States by virtue of legislation enacted to that effect, and that all jurisdiction to levy taxes on real or personal property located in said land had been transferred totally and unconditionally and without restriction to the United States Government.

The Superior Court granted the taxpayer's contention and rendered judgment setting aside the afore-mentioned tax assessment and defendant appeals before us for reversal thereof.

■ Act No. 77 of 1941, which authorized the Governor and the Commissioner of the Interior to sell to the Government of the United States the lands wherein the dry dock is located, remains silent as far as jurisdiction is concerned. However, by Act of February 16, 1903, the People of Puerto Rico gave its consent to the United States to acquire for naval, military or other public purposes, by purchase or condemnation, any lands within the Island of Puerto Rico, and granted exclusive jurisdiction to the United States over any and all lands thus acquired. Said Act provided, however, "that upon the subsequent alienation by the United States of any land so acquired the People of Porto Rico shall again have juris-

diction thereover." It also retained a concurrent jurisdiction with the United States over offenses committed within the limits of the lands of the Island of Culebra, conveyed to the United States.[2]

■ Article I, § 8, clause 17 of the Constitution of the United States grants power to Congress to exercise exclusive jurisdiction over all places purchased with the consent of the Legislature of the State in which the same shall be, for the construction of forts, powder houses, arsenals, docks, and other public buildings. In *Moore* v. *District Court*, 59 P.R.R. 618, this Court decided that said constitutional clause which expressly mentions state legislatures, is not applicable to the

---

[2] Act of February 16, 1903 provides the following in its §§ 5 and 6:

"Section 5.—That consent be and is hereby given to the United States to acquire for naval, military or other public purposes, by purchase or condemnation any lands within the island of Porto Rico, and when so acquired and possession thereof shall have been taken by the United States, all jurisdiction over such lands by the People of Porto Rico shall cease and determine; Provided, however, that upon the subsequent alienation by the United States of any land so acquired the People of Porto Rico shall again have jurisdiction thereover.

"Section 6.—That exclusive jurisdiction be and is hereby ceded to the United States over any and all lands that may hereafter be acquired by it in the island of Porto Rico by purchase or condemnation; and over any and all lands and the shores thereof, including streets and other public highways, conveyed to it by the Governor of Porto Rico under the provisions hereof; and over any and all lands in which any interest or claim of the People of Porto Rico may hereafter be released to the United States by the Governor of Porto Rico as provided herein; Provided, however, that in and over any lands acquired by, or conveyed under the terms hereof to the United States, in the island of Culebra, the People of Porto Rico shall retain a concurrent jurisdiction with the United States over offenses committed within the limits of the lands so conveyed, such jurisdiction however to be exercised only upon the complaint of the officer of the navy or other officer of the United States in charge thereof."

Act No. 2 of November 18, 1953 amended § 5 of the Act of 1903 to include the *lease* as one of the means of acquisition whereby the Government of the United States could acquire exclusive jurisdiction over lands within the Island of Puerto Rico for the purposes stated in said section. (28 L.P.R.A. § 45.)

Act No. 63 of June 10, 1955 repealed the above-mentioned § 5 of the Act of 1903 (28 L.P.R.A. § 45—Cum. Supp. 1956).

Section 3 of the above-mentioned Act No. 63 provides that said jurisdiction shall be understood as ceded upon the express conditions that within

organized and unincorporated territory of Puerto Rico,[3] the Act of 1903 being applicable. It was also stated in this case at 622:

"As may be seen, the Puerto Rican statute and the constitutional clause above cited coincide in that the jurisdiction of the United States shall be exclusive where the acquisition of land in the States, with the consent of their legislatures, is effected by purchase and for the construction of forts, powder houses, arsenals, docks and other necessary buildings (National Constitution), by purchase or condemnation, for naval, military or other public purposes (Territorial Statute). Therefore, resort can and should be had to the decisions construing the constitutional clause in order to determine the scope of the territorial legal provision."

The exclusive jurisdiction which the Government of the United States acquires by virtue of clause 17 of § 8, Art. I of the Constitution (in Puerto Rico by virtue of the Act of February 16, 1903) exempts from state taxation property thus acquired and property located on these premises, even though the latter belong to private institutions and are not government property. See, *Surplus Trading Co.* v. *Cook*, 281 U.S. 647; *S. R. A.* v. *Minnessota*, 327 U.S. 558; *Yellowstone Park Transp. Co.* v. *Gallatin County*, 31 F.2d 644, *cert. denied*

---

the lands acquired by the United States arrests originating under the laws of the Commonwealth of Puerto Rico may be made and summonses originating under the said laws may be served, as well as attachments and other judicial provisions . . . with regard to properties located on the said lands, provided that neither the properties of the United States, neither the use nor benefit which the United States derives from the said properties, nor the purposes for which the lands were acquired, are affected.

Section 4 provides that the jurisdiction granted shall continue only while the United States is the proprietor or is in possession of the lands and the lands are used for the naval, military or other public purposes for which they were acquired. In the event the United States ceases to be proprietor of the lands or to be in possession of the same, or in the event that they are not used for the purposes for which they were acquired, the Commonwealth of Puerto Rico shall again have jurisdiction over the same. (28 L.P.R.A. §§ 56 and 57—Cum. Supp. 1956.)

[3] Since the tax at bar was assessed in January 1952, no issue whatsoever arises regarding the new political status of Puerto Rico.

280 U.S. 555; *City of Franklin* v. *Coleman Bros. Corp.*, 152 F.2d 527; *James* v. *Dravo Contracting Co.*, 302 U.S. 134; *Palmer* v. *Barrett*, 162 U.S. 399; *Benson* v. *United States,* 146 U.S. 325; *Arlington Hotel* v. *Fant*, 278 U.S. 439; *United States* v. *Unzeuta*, 281 U.S. 138; *United States* v. *Fallbrook Public Utility Dist.*, 108 F. Supp. 72; *Wheeling Steel Corp.* v. *Fox*, 298 U.S. 193.

However, the United States Congress has allowed the states to acquire once more the right to levy taxes within the area belonging to and under the exclusive jurisdiction of the United States. The Act known as the Buck Act enacted on October 9, 1940,[4] returned to the States, Territories and Possessions, the power to levy taxes upon sales of gasoline to individuals within a federal area, sales and use taxes occurring within said areas and income taxes on persons residing in the areas where formerly federal jurisdiction had been exclusive for all purposes.[5]

Congress also consented to state taxation by virtue of the Military Leasing Act of August 5, 1947 (61 Stat. 774; in 34 U.S.C. § 522a) according to which the lease contract was granted in favor of plaintiff respondent.

That Act provides, in its pertinent part, that whenever the Secretary of War or the Secretary of the Navy shall deem it to be advantageous to the Government, he is authorized to lease such real or personal property under the control of his Department . . . and is not for the time required for

---

[4] 54 Stat. 1059, codified on June 30, 1947, 61 Stat. 641; 10 U.S.C. § 1270.

[5] In order to interpret the Buck Act sustaining the power of local taxation on the sale, use and revenue of private interests located within Federal land acquired pursuant to Art. I, § 8, Clause 17 of the Constitution and until then under the exclusive jurisdiction of the United States, see: *Sander* v. *Oklahoma Tax Comm.*, 169 P.2d 748 (1946), cert. denied, 329 U.S. 780; *Minn.* v. *Keeley*, 126 F.2d 863; *Hill* v. *Joseph*, 129 N.Y.S. 2d 348 (1954); *Kiker* v. *City of Philadelphia*, 31 A.2d 289, cert. denied, 320 U.S. 741; *Carnegie-Illinois Steel Corp.* v. *Alderson*, 34 S.E.2d 737 (1945), cert. denied, 326 U.S. 764; *Howard* v. *Comm. of Sinking Fund of City of Louisville*, 344 U.S. 624, 97 L. Ed. 617; *City of Springfield* v. *Kenney*, 104 N.E.2d 65.

public use, to such lessee or lessees and upon such terms and conditions as in his judgment will promote the National defense or will be in the public interest. Each such lease shall be for a period not exceeding five years unless the Secretary of the Department concerned shall determine that a longer period will promote the National defense or will be in the public interest. . . . In any event each such lease shall be revocable by the Secretary of the Department concerned during a National emergency declared by the President.

Section 6 of said statute provides that "the lessee's interest" made or created by virtue of the provisions of this Act shall be subject to a state or local taxation.[6]

The fundamental issue in this appeal turns on the interpretation of the above-mentioned § 6 of the Military Leasing Act of 1947, as well as on the scope of the concept "alienation" used in the Act of February 16, 1903.

The Government alleges that (1) under the Military Leasing Act of 1947, Congress consented to state taxation on real and personal property located within the premises leased by the United States under said Act and (2) "that as a consequence of the lease made to respondent, the land was alienated by the Government of the United States and, consequently, by virtue of the provisions of the very Act of February 16, 1903, Puerto Rico again acquired jurisdiction over the premises."

On the other hand, plaintiff-respondent and the "amicus curiae" allege that the taxation authorized by the afore-mentioned Act of 1947 constitutes taxation on the lessee's interest as lessee over the leased property, that is, that in order that the "lessee's interest" should involve a specific property there should exist a relation of landlord and tenant regarding said property; that the property assessed by the Secretary of the

---

[6] The English text copied verbatim reads:

"Sec. 6.—The lessee's interest made or created pursuant to the provisions of this Act shall be made subject to a state or local taxation . . . "

Treasury are personal property belonging to respondent without said property having been leased, nor is there, with respect thereto, any landlord and tenant relation between the United States and the respondent; that the laws of Puerto Rico do not authorize the assessment of tax on the lesseehold interest on property.

The Military Leasing Act of 1947 has been subject to interpretation by the state courts as well as by the National Supreme Court.

The parties amply discuss the scope of the decision in the case of *Offutt Housing Co.* v. *Sarpy County,* 351 U.S. 253, 100 L. Ed. 1151. The facts of said case are as follows: Offutt, a Nebraska corporation organized primarily to provide housing for rent or sale, entered into a contract with the Secretary of the Air Force to lease 63 acres of land and to build a housing project on Offutt Air Force Base in accordance with specifications submitted by the Department of the Air Force, and to be approved by the Federal Housing Commissioner. The lease was for 75 years and the rental of $100 per year. It provided that "the buildings and improvements erected by the lessee, constituting the aforesaid housing project, shall be and become, as completed, real estate and part of the leased land, and public buildings of the United States, leased to lessee. . . ." It further provided that upon the expiration of this lease, or earlier termination, all improvements made upon the leased premises shall remain the property of the Government without compensation. The lessee corporation was to lease all the units of the project to such military and civilian personnel at the Base as were designated by the Commanding Officer, on terms specified in the contract and at a maximum rent approved by the Federal Housing Administration and the Air Force. The contract contained other provisions related to the operation of the project regarding public services, insurance, utilities, and

regarding the intervention of the Commissioner of the Federal Housing Administration, who would hold the preferred stock of petitioner acting under Title VIII of the National Housing Act. After the signing of the contract, construction proceeded and no tax return was filed, although the Attorney General of Nebraska had ruled that its interest in the project, including all of the personal property used therein, was taxable as "personal property." Sarpy County assessed taxes against petitioner on the furniture, tools, and equipment, household appliances, and improvements on leased land.

The Supreme Court of the United States, in affirming the judgment of the Supreme Court of Nebraska, sustained the lawfulness of taxation and decided that by virtue of the provisions of the Military Leasing Act of 1947, and the Wherry Military Housing Act of 1947, Congress had consented to such taxation as was involved therein.

The taxpayer argued that the state tax, measured by the full value of the buildings and improvements, is not on the "lessee's interest" but on the full value of property owned by the Government. In relation to this the Court stated that labelling the Government as "the owner" did not foreclose ascertaining the nature of the real interests created, and did not solve the question. It considered that since the lease was for 75 years and the buildings and improvements had an estimated useful life of 35 years, the enjoyment of the entire worth of the buildings and improvements would be petitioner's and that if so, the Government's title would only be a paper title.

The lessee further argued that the tax on the appliances and furniture was invalid because petitioner owned those items, never bought them from the Government, and that therefore its interest was not made or created pursuant to the provisions of the Military Leasing Act of 1947. On this point the Court stated: "Here again using a label, that of

'owner,' as descriptive of petitioner does not answer the question. It appears from the record that petitioner was required to supply the appliances for the housing project. Petitioner and its tenants will have full use of them for the lease period and they or their replacements must be left on the property at the end of the lease. Petitioner's interest in the appliances, just like its interest in the buildings, is determined by its agreement with the Government and, keeping in mind the purpose of § 6, we interpret that section as treating these items alike."

In order to determine the scope of the decision in Offutt, it is essential to refer to footnote 2 of said opinion. It reads: "The record does not indicate clearly the relationship of the parties with respect to the furniture—valued at $205 in the total 1952 valuation of the taxable property at $825,685. This is a minor matter and we leave petitioner to seek redress in the Nebraska courts should the interests of the Government and petitioner in the furniture be significantly different from their interests in the appliances or buildings."

In our opinion the *Offutt* case establishes (*a*) that the Wherry Act should be read as if it includes § 6 of the Military Leasing Act of 1947, (*b*) that according to the facts of the case the local tax on lessee's interest may be assessed measured by the full value of the buildings and improvements, and (*c*) that lessee's interest in the personal property which it was obliged to provide for the housing project, just like his interest in the buildings, is determined by its agreement with the Government and that § 6 treated both items alike.

We do not agree with the Government in that *Offutt* directly decides the issue involved herein. Rather it may be inferred from the opinion delivered in said case, since it does not decide it, that the power of exclusive legislation conferred on Congress to federal areas by Art. I, § 8, Clause 17 of the National Constitution, forecloses state taxation on private

property located in a military base acquired pursuant to said constitutional provision if said property is not part of the "lessee's interest" made or created by the lease contract.

When the Federal Supreme Court was faced with lessee's allegation to the effect that the tax on appliances and furniture was invalid because said lessee owns those items, never bought them from the Government, and that therefore its interest was not made or created pursuant to the provisions of the Military Leasing Act of 1947, it would have been sufficient for said court, in the event that the Secretary of the Treasury was correct, to dispose of the question by saying that under § 6 of the above-mentioned Military Leasing Act, Congress had consented to state taxation on private personal property located in federal premises leased pursuant to said Act. Far from deciding it thus, the court resorted to the argument that lessee's interest in the afore-mentioned personal property is made in the contract with the Government because lessee was obliged to furnish them and that therefore it was an interest similar to its interest in the buildings.

We infer that in *Offutt*, the validity of the local tax was upheld on the basis that the same was levied on "lessee's interest" made or created pursuant to the Military Leasing Act of 1947.

In some former cases and in subsequent ones, courts have followed the same doctrine as in the *Offutt* case, upholding the validity of local or state tax on "lessee's interest" made or created pursuant to the Military Leasing Act. See, *Meade Heights* v. *State Tax Comm.*, 95 A.2d 280; *Bragg Investment Co.* v. *Cumberland County*, 96 S.E.2d 341; *Fort Dix Apartments Corp* v. *Borough of Wrightstown*, 225 F.2d 473. *Cf. Nellis Housing Corp.* v. *State*, 339 P.2d 758 (1959).

In *International Business Machine Corp.* v. *Vaughn*, 98 So.2d 747 (1957), which cites the *Offutt* case, it was decided that certain electric accounting machines owned by a private

enterprise but located on federal land ceded by the State of Florida, were not subject to state or local tax because Florida gave United States Government exclusive jurisdiction without reserving the power of taxation, and neither did Congress consent to it.

In *International Business Machine Corp.* v. *Ott*, 89 So.2d 193 (1956), the State of Louisiana was equally deprived of its tax jurisdiction on personal property belonging to individuals and located on sites ceded to the Government of the United States by said state.

After the *Offutt* case, the National Supreme Court has decided three cases involving state taxation in relation with federal property. In none of them is the issue at bar decided, since they did not involve state taxation of private property within the boundaries of sites belonging to/and under the exclusive jurisdiction of the United States. Besides, in said cases there was a state law which expressly levied the tax challenged.

In one of those cases, *United States* v. *Detroit*, 355 U.S. 466, 2 L. Ed. 424, a Michigan Act provided that when tax-exempt real property is used by a private party in a business conducted for profit, such private party is subject to taxation as though it owned the property. Here the United States was the owner of an industrial plant which was leased to the taxpayer. The statute provided that neither the property nor the owner was liable for the payment of taxes. The Supreme Court upheld the validity of the tax on the ground that the tax was imposed on the privilege of using the property and not on the property itself, even if the value of the property was taken as a measure for the levying of the tax.

In *Detroit* v. *Murray Corp.*, 355 U.S. 489, 2 L. Ed. 2d 421, the same Michigan Act was involved. The local tax was assessed on personal property consisting in airplane parts, instruments and materials which were in the possession of

a subcontractor and by agreement, title thereof was vested in the United States upon partial payment of the same. Taxation was sustained on the ground that in its effects the tax was similar to that assessed on persons using tax-exempt property. In *United States* v. *Township of Muskegon,* 355 U.S. 484, 2 L. Ed.2d 436, the same basic issue is involved as in the case of *United States* v. *Detroit, supra.* The only two differences consist in that the taxpayer was using government property by virtue of a permit, and not of a lease contract and that the taxpayer was using said property in carrying out a contract with the Government.

We are aware that in the *Offutt* case emphasis is given to the fact that the legislative history of the Military Leasing Act indicates the concern of Congress for the loss of revenue to the States and its desire to prevent unfairness toward competitors of the private interests located without federal areas. Likewise, we have observed the tendency of the National Supreme Court to limit, by interpretation, the constitutional tax immunity when it is a matter of a private business conducted for its own private gain. However, we may not interpret the Military Leasing Act of 1947 as if it included the consent of Congress to state taxation of private personal property located in leased federal property, if such consent is not expressed in or inferred from said Act. In order that the "lessee's interest" be subject to state tax, it should be made or created pursuant to the Military Leasing Act as in the *Offutt* case and others. In these cases the lessee had an interest in the lease consisting in the enjoyment of the real and personal property and in which the government also had an interest since it came to possess the same when the life of the lease came to an end. The Government's interest in said items was not subject to tax but lessee's interest was because the same was made or created by virtue of the contract made pursuant to the provisions of the Military Leasing Act.

In the case at bar the tax has been assessed on personal property belonging exclusively to lessee, not acquired by virtue of any obligation imposed upon it by the lease contract, and shall not belong to the United States upon expiration of the lease. The Federal Government is not interested in said items and the lessee's interest in the same has not been made or created pursuant to the provisions of the Military Leasing Act. Consequently, it is appropriate to conclude that pursuant to the provisions of said Act, and the Act of 1903 of Puerto Rico, the afore-mentioned property is not taxable. In reaching this conclusion we have not considered the scope and effect of Act No. 63 of July 10, 1955, which repealed § 5 of the Act of 1903. See the former footnote 2.

■ Appellant raised another issue to the effect that the Government of the United States lost its jurisdiction when it leased the lands. Its thesis is grounded in that a "lease" is equivalent to an "alienation" according to the use of this last term in the Act of 1903.[7]

We do not agree. Appellant himself admits that as a general rule, the term "alienation" in its narrow sense, does not include lease since *"Alienation* in its narrow sense, implies the transfer of the ownership of a thing, which undoubtedly did not occur in the present case." According to the Spanish Law, alienation in its broadest sense does not include the lease either. See, *García et al.* v. *Garzot*, 18 P.R.R. 835.

---

[7] The life of the lease was five years with an option for three additional terms of 5 years upon previous written notice to the lessor, 120 days in advance to the expiration of the contract.

The contract provides, besides, that the Secretary of the Navy may terminate the contract at any time before its date of expiration (*a*) during any National emergency declared by the President or by Congress, (*b*) by previous notice written to lessee 90 days in advance when the Secretary determines that national interests so require it, and (*c*) by previous notice to lessee with 10 days in advance if (1) lessee failed to comply with any one of its obligations and did not rectify them within 10 days, . . . and (2) . . . .

650

The case of *R. Fabián & Co.* v. *The Registrar*, 22 P.R.R. 744, cited by appellant, decided that a power given to alienate, sell, encumber, mortgage, assign, and exchange the real property does not give power to lease. "The power of leasing —it was said at 745—might perhaps be considered as an act of administration, but no power to administer was given. . . . " See *Berrocal* v. *Dist. Court and Fournier, Int.*, 75 P.R.R. 79, 88, and *Pérez* v. *Hawayek*, 69 P.R.R. 46.

Regarding the controversial problem of whether the lease creates in favor of lessee a right of a real nature or a mere personal right, or a right of credit, a problem which we do not intend to solve now and to which we merely refer by way of illustration, Castán adheres to this last concept and states: "The lease, a right of a personal nature may, in virtue of the registration (in the cases wherein the latter lies, according to the Mortgage Law) *produce a certain real effect*, such as forcing the purchaser of the estate to honor the lease. (Section 1571 of the Civil Code.) But this partial effect does not modify the juridical relation. 'The content of the lessee's rights—as Pérez González and Alguer state— is not altered by the registration thereof, but they only remain guaranteed before the ultimate purchaser.' Therefore the lease does not lose its nature of a merely obligatory relation." (Castán, vol. 4 at 241.)

A slight examination of the provisions of our Civil Code concerning the lease contract, dissipates any doubt as to the term *to alienate* used in the Act of 1903, which does not include a lease as the one here involved.[8]

In view of the foregoing, the judgment of the Superior Court, San Juan Part, is affirmed.

Mr. Justice Belaval dissented.

Mr. Justice Santana Becerra did not participate herein.

---

[8] Nevertheless, see *De la Haba* v. *Tax Court; Treas., Int.*, 76 P.R.R. 865, regarding leases constituting in themselves a transfer of property.