## OFFUTT HOUSING CO. *v.* COUNTY OF SARPY ET AL.

No. 404.   Argued April 26, 30, 1956.—Decided May 28, 1956.

*Robert L. Stern* argued the cause for petitioner.   With him on the brief was *Charles S. Reed.*

*Dixon G. Adams* and *Orville Entenman* argued the cause for respondents.   With them on the brief was *Clarence S. Beck,* Attorney General of Nebraska.

*Solicitor General Sobeloff, Acting Assistant Attorney General Rice, Hilbert P. Zarky* and *Edwin A. Goldstein* filed a brief for the United States, as *amicus curiae,* urging reversal.

*Jennings P. Felix* filed a brief for Grant County, Washington, as *amicus curiae,* urging affirmance.

MR. JUSTICE FRANKFURTER delivered the opinion of the Court.

This suit was brought by petitioner against respondent county and its treasurer for a declaratory judgment that petitioner was not required to pay certain state and county "personal property" taxes and for an injunction against the levy of such taxes on that property. The controlling facts are not in dispute. Petitioner is a Nebraska corporation organized primarily to provide housing for rent or sale. On January 18, 1951, petitioner entered into a contract with the Secretary of the Air Force to lease 63 acres of land and to build a housing project on Offutt Air Force Base in respondent county in accordance with specifications submitted to the Department of the Air Force and to be approved by the Federal Housing Commissioner.

The lease was for 75 years at a rental price of $100 per year. It provided that the "buildings and improvements erected by the Lessee, constituting the aforesaid housing project, shall be and become, as completed, real estate and part of the leased land, and public buildings of the United States, leased to Lessee . . ." and further provided that "upon the expiration of this lease, or earlier termination, all improvements made upon the leased premises shall remain the property of the Government without compensation . . . ." Petitioner was to lease all the units of the project to such military and civilian personnel at the Base as were designated by the Commanding Officer,

on terms specified in the contract and at a maximum rent approved by the Federal Housing Administration and the Air Force. The Government was to provide fire and police protection to the project on a reimbursable basis. Petitioner had the right to permit public utilities to extend water, gas, sewer, telephone, and electric power lines onto the leased land in order to provide those services. Petitioner agreed to insure the buildings at its own expense, to permit Government inspection of the premises, and to comply with regulations prescribed by the Commanding Officer for military requirements for safety and security purposes, consistent with the use of the leased land for housing. Petitioner could not assign the lease without the written approval of the Secretary of the Air Force.

The preferred stock of petitioner was held by the Commissioner of the Federal Housing Administration which, acting under Title VIII of the National Housing Act (the Wherry Military Housing Act), 63 Stat. 570, insured a mortgage on the project after receiving a certificate from the Department of the Air Force that a housing project was necessary to provide adequate housing for civilian or military personnel. After the signing of the contract and the insurance of the mortgage, construction proceeded forthwith. Petitioner filed no county tax return, although the Attorney General of Nebraska had ruled that its interest in the project, including all of the "personal property" used therein, was taxable as "personal property." On June 23, 1952, the county assessor of Sarpy County filed a schedule on behalf of petitioner, listing a taxable total of $825,685, itemized as "Furniture & Fixtures— Tools & Equipment"; "Household Appliances"; and "Improvements on Leased Land." Petitioner never paid the resulting county and state taxes, and after the county treasurer threatened to issue the usual distress warrant to collect the taxes, petitioner brought this suit.

The District Court of Sarpy County held that, since title to the buildings and improvements was in the United States, Nebraska and Sarpy County could not tax them. The Supreme Court of Nebraska reversed, holding that Congress had given Nebraska the right to tax petitioner's interest in the property and that for tax purposes, under Neb. Rev. Stat., Reissue 1950, § 77–1209, petitioner was in fact and as a matter of law the owner of the property sought to be taxed. 160 Neb. 320, 70 N. W. 2d 382. Petitioner's attack on the Nebraska judgment raises serious questions of state-federal relations with respect to taxation of private housing developments on Government-owned land, and therefore we granted certiorari. 350 U. S. 893.

This is another in a long series of cases in this Court dealing with the power of the States to tax property in private hands against a claim of exempt status deriving from an immunity of the Federal Government from state taxation. Offutt Air Force Base falls within the scope of Article I, § 8, cl. 17 of the United States Constitution, providing that the Congress shall have power

> "To exercise exclusive Legislation in all Cases whatsoever, over such District [of Columbia] . . . and to exercise like Authority over all Places purchased by the Consent of the Legislature of the State in which the same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings . . . ."

The course of construction of this provision cannot be said to have run smooth. The power of "exclusive Legislation" has been held to prohibit a state tax on private property located on a military base acquired pursuant to Art. I, § 8, cl. 17. *Surplus Trading Co.* v. *Cook,* 281 U. S. 647. On the other hand, the State may acquire the right to tax private interests within such a location

by permission of Congress, see, *e. g.,* the Buck Act, 54 Stat. 1059 (permitting state sales, use, and income taxes), and we have also held that the State may tax when the United States divests itself of proprietary interest over the area on which the tax is sought to be levied. *S. R. A., Inc.* v. *Minnesota,* 327 U. S 558; see also *Baltimore Shipbuilding Co.* v. *Baltimore,* 195 U. S. 375.

The line of least resistance in analysis of our immediate problem is to ascertain whether Congress has given consent to the type of state taxation here asserted. The applicable congressional statutes are the Military Leasing Act of 1947 and the Wherry Military Housing Act of 1949 (adding Title VIII to the National Housing Act). The Military Leasing Act provides:

> "That whenever the Secretary of War or the Secretary of the Navy shall deem it to be advantageous to the Government he is authorized to lease such real or personal property under the control of his Department as is not surplus to the needs of the Department within the meaning of the Act of October 3, 1944 (58 Stat. 765), and is not for the time required for public use, to such lessee or lessees and upon such terms and conditions as in his judgment will promote the national defense or will be in the public interest. Each such lease shall be for a period not exceeding five years unless the Secretary of the Department concerned shall determine that a longer period will promote the national defense or will be in the public interest. . . . Each such lease shall contain a provision permitting the Secretary of the Department concerned to revoke the lease at any time, unless the Secretary shall determine that the omission of such provision from the lease will promote the national defense or will be in the public interest. In any event each such lease shall be revocable by the Sec-

retary of the Department concerned during a national emergency declared by the President. . . . The authority herein granted shall not apply to oil, mineral, or phosphate lands. . . .

.        .        .        .        .

"Sec. 6. The lessee's interest, made or created pursuant to the provisions of this Act, shall be made subject to State or local taxation. Any lease of property authorized under the provisions of this Act shall contain a provision that if and to the extent that such property is made taxable by State and local governments by Act of Congress, in such event the terms of such lease shall be renegotiated." 61 Stat. 774–776.

Two years later, the Wherry Act provided:

"Whenever the Secretary of the Army, Navy, or Air Force determines that it is desirable to lease real property within the meaning of the Act of August 5, 1947 (61 Stat. 774), to effectuate the purposes of this title, the Secretary concerned is authorized to lease such property under the authority of said Act upon such terms and conditions as in his opinion will best serve the national interest without regard to the limitations imposed by said Act in respect to the term or duration of the lease, and the power vested in the Secretary of the Department concerned to revoke any lease made pursuant to said Act in the event of a national emergency declared by the President shall not apply. . . ." 63 Stat. 570, 576.

These two Acts interlock and must be read together. The reasonable relationship between them has been thus delineated by the Court of Appeals for the Third Circuit:

"In our view this provision of the National Housing Act [the 1949 Act] merely permits leasing for

military housing purposes, already covered by the general authorization of the 1947 Act, to be accomplished without regard to specified restrictions of the 1947 Act, when the elimination of these restrictions would serve the purposes of the Housing Act. Other provisions of the 1947 Act, including the language of Section 6 subjecting the lessee's interest to local taxation, apply to leases made under the authority of both Acts.

"We have not overlooked the argument for a narrower view of the scope of the 1947 Act based upon legislative history indicating that the primary purpose of that Act was to provide for the leasing of stand-by defense plants. But the language of the Act extends the leasing authority to all non-surplus property under the control of the Defense Department except oil, mineral, or phosphate lands (an exception which would be unnecessary if the Act applied only to defense plants). An additional indication that the 1947 Act encompasses the leasing of property generally is found in Section 2 which repeals the prior authority for the leasing of War Department property generally, 27 Stat. 321. The Senate Report expresses the reporting committee's understanding that this prior leasing statute was being 'entirely superseded'. Sen. Rep. No. 626, 1947, 80th Cong. 1st Sess. [p. 3]." *Fort Dix Apartments Corp.* v. *Borough of Wrightstown,* 225 F. 2d 473, 475–476.

We agree with this. To be sure, the 1947 Act does not refer specifically to property in an area subject to the power of "exclusive Legislation" by Congress. It does, however, govern the leasing of Government property generally and its permission to tax extends generally to all lessees' interests created by virtue of the Act. The legis-

lative history indicates a concern about loss of revenue to the States and a desire to prevent unfairness toward competitors of the private interests that might otherwise escape taxation. While the latter consideration is not necessarily applicable where military housing is involved, the former is equally relevant to leases for military housing as for any other purpose.

We do not say that this is the only admissible construction of these Acts. We could regard Art. I, § 8, cl. 17 as of such overriding and comprehensive scope that consent by Congress to state taxation of obviously valuable private interests located in an area subject to the power of "exclusive Legislation" is to be found only in explicit and unambiguous legislative enactment. We have not heretofore so regarded it, see *S. R. A., Inc.* v. *Minnesota,* 327 U. S. 558; *Baltimore Shipbuilding Co.* v. *Baltimore,* 195 U. S. 375, nor are we constrained by reason to treat this exercise by Congress of the "exclusive Legislation" power and the manner of construing it any differently from any other exercise by Congress of that power. This is one of those cases in which Congress has seen fit not to express itself unequivocally. It has preferred to use general language and thereby requires the judiciary to apply this general language to a specific problem. To that end we must resort to whatever aids to interpretation the legislation in its entirety and its history provide. Charged as we are with this function, we have concluded that the more persuasive construction of the statute, however flickering and feeble the light afforded for extracting its meaning, is that the States were to be permitted to tax private interests, like those of this petitioner, in housing projects located on areas subject to the federal power of "exclusive Legislation." We do not hold that Congress has relinquished this power over these areas. We hold only that Congress, in the exercise of this power, has per-

mitted such state taxation as is involved in the present case.

Petitioner also argues that the state tax, measured by the full value of the buildings and improvements, is not on the "lessee's interest" but is on the full value of property owned by the Government. Labeling the Government as the "owner" does not foreclose us from ascertaining the nature of the real interests created and so does not solve the problem. See *Millinery Center Building Corp.* v. *Commissioner*, 350 U. S. 456. The lease is for 75 years; the buildings and improvements have an estimated useful life of 35 years. The enjoyment of the entire worth of the buildings and improvements will therefore be petitioner's.

Petitioner argues, however, that the Government has a substantial interest in the buildings and improvements, since the Government prescribed the maximum rents and determined the occupants, had voting interests in petitioner, provided services, and took the financial risks by insuring the project. Petitioner compares its own position to that of a "managing agent." This characterization is an attempt by use of a phrase to make these facts fit an abstract legal category. This contention would certainly surprise a Congress which was interested in having private enterprise and not the Government conduct these housing projects. The Government may have "title," but only a paper title, and, while it retained the controls described in the lease as a regulatory mechanism to prevent the ordinary operation of unbridled economic forces, this does not mean that the value of the buildings and improvements should thereby be partially allocated to it. If an ordinary private housing venture were being assessed for tax purposes, the value would not be allocated between an owner and the mortgage company which does his financing or between the owner and the State, which may fix rents and provide

services. In the circumstances of this case, then, the full value of the buildings and improvements is attributable to the lessee's interest.[1]

Petitioner further argues that the tax on the appliances and furniture is invalid because petitioner owns those items, never bought them from the Government, and that therefore its interest was not "made or created pursuant to the provisions of this Act [the Military Leasing Act of 1947]." Here again using a label, that of "owner," as descriptive of petitioner does not answer the question. It appears from the record that petitioner was required to supply the appliances for the housing project. Petitioner and its tenants will have full use of them for the lease period and they or their replacements must be left on the property at the end of the lease. Petitioner's interest in the appliances, just like its interest in the buildings, is determined by its agreement with the Government and, keeping in mind the purpose of § 6, we interpret that section as treating these items alike.[2]

For these reasons the judgment of the Supreme Court of Nebraska must be

*Affirmed.*

---

[1] The record before us is unclear whether the estimated useful life of all the appliances and furniture is less than the lease period. To the extent that the estimated useful life of any of these items extends beyond the term of the lease, the value attributable to such period must be excluded from the tax, since it represents the Government's ownership interest. In the present state of the record, however, petitioner's remedy, if any, is in the Nebraska courts, not here.

[2] The record does not indicate clearly the relationship of the parties with respect to the furniture—valued at $205 in the total 1952 valuation of the taxable property at $825,685. This is a minor matter and we leave petitioner to seek redress in the Nebraska courts should the interests of the Government and petitioner in the furniture be significantly different from their interests in the appliances or buildings.

Mr. Justice Douglas, with whom Mr. Justice Reed, Mr. Justice Burton, and Mr. Justice Harlan concur, dissenting.

There are two reasons why I dissent in this case.

*First.* The legislative history of the Wherry Act makes clear that the purpose of the legislation was to encourage military personnel to remain in the Armed Forces by providing clean, adequate, and inexpensive housing for them. H. R. Rep. No. 854, 81st Cong., 1st Sess., pp. 2, 4; S. Rep. No. 410, 81st Cong., 1st Sess., pp. 2, 4–5. There is nothing to indicate that Congress departed from the established practice (*Surplus Trading Co.* v. *Cook,* 281 U. S. 647) and consented to local taxation on the federal enclaves. Taxation by local authorities of a housing project is one sure way of increasing its cost and hampering the federal program. If that had been intended, I would expect plain language revealing the purpose. The Court finds no plain language but relies only on adumbration and reasoning from elaborate implication. Yet the "doctrine of sovereign immunity is so embedded in constitutional history and practice that this Court cannot subject the Government or its official agencies to state taxation without a clear congressional mandate." *Kern-Limerick, Inc.* v. *Scurlock,* 347 U. S. 110, 122.

To be sure, the Wherry Act and the Military Leasing Act are intertwined and § 6 of the Leasing Act makes the "lessee's interest" subject to local taxation. But the intertwining of the two Acts is very limited. Section 805 of the Wherry Act authorizes the Secretaries of the Armed Forces to make leases under the authority of the Leasing Act, without regard to the limitations imposed by it as respects the term or duration of the lease. But the authority to lease and the limitations imposed on leases are contained in § 1 of the Leasing Act. Nothing in the language of § 805 requires the balance of the Act to be

264

incorporated. We strain beyond the normal demands of language to pull § 6 of the Leasing Act into the Wherry Act. Section 807 of the Wherry Act deals with taxation. It allows local taxation of real property acquired by the Federal Housing Commissioner. I would suppose that if local taxation is specifically allowed in one instance, the waiver of immunity is limited, not general. We usurp the function of the lawmakers when we hold to the contrary.

*Second.* Even if the Wherry Act be read as including § 6 of the Leasing Act, we should rebel at the application now given it. Section 6 of the Leasing Act, if applicable, only subjects the "lessee's interest" to local taxation. Yet the Court allows the local tax to be placed on the entire value of the property. Its justification apparently is the low annual rental charged by the United States to the lessee, the length of the lease, and the useful life of the buildings and improvements. The "enjoyment of the entire worth" of the property will be the lessee's, says the Court. The interest of the Federal Government is therefore nominal. For these reasons the "lessee's interest" is held to include the entire value of the property.[1]

This formalism misses the entire point. The Government's stake here cannot be measured by bare legal title. It has vast and important interests in these projects. It owns the controlling stock in the lessee. It prescribes the maximum rentals. It determines what persons may occupy the living quarters. It assumes most of the financial risks of these housing projects by insuring the mortgagees. It provides police and fire protection, sewerage and water service, and access roads. The United

---

[1] It is of interest that an effort was made in the Senate Committee on Armed Services to provide in the Leasing Act that when property was leased by the Government the entire value be subject to local taxation. See Hearings, Senate Committee on Armed Services on S. 1198, 80th Cong., 1st Sess., pp. 27–32. But that proposal was rejected by the Senate Committee.

States is not a mere lessor who, having leased the property, allows it to be managed by the lessee. The great decisions as to management are made by the Government. The lessee is, indeed, a managing agent.

The lease makes the buildings and improvements property of the United States. That reservation of title may not be challenged here as colorable. See *Kern-Limerick, Inc.* v. *Scurlock, supra,* 116–123. It was made to protect the large interests of the United States in low-cost housing on federal enclaves—a purpose now partially defeated by what we do today. For, once the local taxes are imposed, the rentals to the servicemen rise, unless the United States pays the bill. Ironically, the rents rise without the servicemen receiving more benefits of local government than even transients receive. The tax is a windfall to the local Nebraska authorities as the Federal Government provides the governmental services protective of the property taxed.[2]

---

[2] Under the Buck Act, 54 Stat. 1059, as amended, 4 U. S. C. §§ 104–110, residents of military reservations pay state sales, use, income, and gasoline taxes.