# Third District Court of Appeal

**State of Florida**


Opinion filed March 11, 2015.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D14-746
Lower Tribunal No. 12-831-K
_____


**Scott P. Russell,**
Appellant,

vs.

**Southeast Housing, LLC, etc.,**
Appellee.


An Appeal from the Circuit Court for Monroe County, David J. Audlin, Jr., Judge.

Dent & McClain, Chartered, and John C. Dent, Jr., and Jennifer A. McClain (Sarasota), for appellant.

Pamela Jo Bondi, Attorney General, and David J. Glantz and William H. Stafford (Tallahassee), Assistant Attorney General; Lowndes, Drosdick, Doster, Kantor & Reed, P.A., and James M. Spoonhour and S. Brendan Lynch (Orlando); Horan, Wallace & Higgins, LLP, and David Paul Horan (Key West), for appellee.


Before SHEPHERD, C.J., and EMAS and LOGUE, JJ.

LOGUE, J.

Scott P. Russell, as Property Appraiser of Monroe County, Florida, appeals a judgment holding that certain properties were not subject to ad valorem taxes for the years 2008 through 2013. The properties are five military housing complexes serving the Naval Air Station at Key West. The housing complexes are being improved and operated pursuant to a public-private partnership between the United States Navy and a private developer. The terms of the public partnership are set forth in the ground lease, operating agreement, and management agreement. A review of these three documents reveals that the Navy retained equitable and beneficial ownership of the properties. Because property owned by the United States is immune from state taxation, we hold the properties are immune from Florida ad valorem taxes.

FACTS AND PROCEDURAL HISTORY

The State of Florida transferred the properties at issue to the United States for military purposes including "forts, magazines, arsenals, dockyards, and other needful buildings," through a series of deeds dating as far back as the nineteenth century. In the decades leading up to the facts giving rise to this case, the United States used the properties for military housing. In 1996, Congress enacted the Military Housing Privatization Initiative, codified at 10 U.S.C. sections 2878 et seq., which authorized "public/private ventures" to facilitate the upgrading of United States Military housing through private lending and redevelopment. In

2007, the Navy partnered with BBC Military Housing–Navy Southeast, LLC ("BBC"),[1] to enhance various naval housing developments in the southeast United States, including the military housing at the Naval Air Station at Key West. The Navy's solicitation required applicants to present a pro forma that assumed the properties would be subject to state ad valorem taxation, which BBC did. BBC believed that the project would be viable even if the properties were subject to ad valorem taxes.

The Navy and BBC then took a series of steps to effectuate the private/public venture. First, the Navy and BBC created the Appellee in this lawsuit, Southeast Housing, LLC ("Southeast Housing"), a for-profit corporation whose income is subject to federal income taxes. Southeast Housing was created to lease the land, to assume title to the improvements, and to demolish, reconstruct, maintain, and operate the housing units. Southeast Housing was also empowered to issue debt in the form of taxable revenue bonds. In accordance with their partnership, BBC contributed capital to Southeast Housing in the amount of approximately 7.5 million dollars and the Navy contributed approximately 73.2 million dollars, plus the properties as described below.

---

[1] Technically, the entity chosen was GMH Housing LLC, which only later became BBC. For ease of reference, we refer to both GMH and BBC as "BBC." BBC's parent company is Balfour Beatty, PLC, a for-profit company registered in London, England.

Second, the Navy granted Southeast Housing a fifty-year ground lease of the land under the buildings for the nominal payment of ten dollars. This ground lease also conveyed to Southeast Housing legal title to "all facilities and improvements, including the existing Housing units and any equipment . . . and related infrastructure." The ground lease limits the use of the properties to housing. It makes Southeast Housing's access to the leased properties "subject to the security procedures from time to time established by the government." The ground lease also provides that BBC "shall be responsible for the payment of any applicable and enforceable taxes, assessments and similar charges on the Leased Premises applicable to and enforceable against the Leased Premises during the Term of this Lease prior to such amounts becoming delinquent." At the end of the fifty-year lease term, "all improvements and personal property (and all replacements therefor) located" on the leased properties shall be abandoned in place and become the property of the Navy. Such improvements and personal property shall be returned to the Navy "in good, clean order and repair (ordinary wear and tear excepted)."

Third, the Navy and BBC entered into an operating agreement to govern Southeast Housing, under which BBC serves as the managing member. As managing member, BBC has "sole and absolute" discretion regarding tax matters. It also has "sole and exclusive management and control of the business of the

4

Company." Although BBC, as managing member, is required to demolish old buildings and construct new ones, any such construction must conform to the Navy's plans, specifications, and design/build agreements, which are expressly incorporated by reference into the operating agreement. Any changes to those plans must be approved by the Navy. The Navy is entitled to appoint its own Resident Officer in Charge of Construction to inspect construction, review plans, analyze construction reports, and examine government permits to ensure compliance with the plans, quality standards, and laws.

As managing member, BBC is also empowered to rent the housing units, but the Navy retains substantial rights regarding rental. First, individuals referred by the Navy's Housing Service Center have preference in rental of the units. Indeed, except for one property which was sold, ninety-eight percent of the tenants are military or civilian employees of the Department of Defense. Second, although BBC can charge non-military renters fair market value, the rents charged to the individuals referred by the Navy's Housing Service Center are tied to a sailor's basic housing allowance, not fair market value. This cap prevents military personnel from being out-of-pocket for the difference between the housing allowance and the actual fair-market-value rent, which can occur where military personnel must go into the private rental market to obtain housing. Third, pursuant to the ground lease, the Navy must approve the form of the written lease signed by

5

the renters. Fourth, the Navy alone decides whether utilities for the units are billed separately to the individual units. Finally, if Southeast Housing requires any individuals referred by the Navy's Housing Service Center to move for the convenience of Southeast Housing (e.g., to facilitate construction), Southeast Housing must pay the renters for their relocation expenses in an amount determined by the Navy.

BBC, in its capacity as managing member, can issue debt, sell property, assign or transfer its ownership interest, award incentive fees to contractors, place the company in receivership, or institute proceedings in bankruptcy. BBC, however, can take these actions only if the Navy approves.

The operating agreement envisions the hiring of a third party property manager, asset manager, developer, construction consultant, and code compliance agent. The Navy has the right to direct Southeast Housing to terminate any or all of these agents at any time. However, BBC cannot replace any of these agents without the approval of the Navy. Under certain circumstances, the Navy can remove BBC from the venture; under no circumstances can BBC remove the Navy.

Lastly, the operating agreement reflects that the Navy keeps substantial control of the income from the properties. BBC prepares an annual budget reflecting operating expenses, capital repair and replacement, and estimated

revenues, but it is subject to approval by the Navy. Furthermore, the distribution of all revenues from the properties is strictly controlled by the operating agreement. Generally, monthly revenues are paid in the following order: approved operating budget, monthly debt payment, monthly payment into the Capital Repair and Replacement Account in an amount set forth in the operating agreement, payments necessary to keep current certain incentive fee accounts, and the Asset Management fee account. The remainder is distributed 10% to BBC (until its capital contribution is repaid) and 90% to the Project Recapitalization Account. The Navy approves the person named as trustee of the Project Recapitalization Account. It controls where the funds in these accounts can be invested. No funds can be paid out of this account without the approval of the Navy. At the end of the project, the Navy receives the funds and all earnings in this account.

In April and May of 2007, as the project was being finalized, BBC met and exchanged documents with Karl Borglum, who was then the Property Appraiser of Monroe County, and who is the predecessor to Appellant Property Appraiser. As a result of these meetings, Mr. Borglum wrote BBC "the Property Appraiser's Office does not find that any taxable interest is created in or through the ground lease or management relationship between [BBC] and the Navy." He concluded, "Key West Naval Air Station is a federally owned facility and as such exempt under Florida law." As indicated by this letter, the Property Appraiser continued to treat

7

this military housing as tax exempt after the agreements between the Navy and BBC became effective. On July 3, 2012, however, the Property Appraiser changed course: he issued notices of tax liens on each of the properties for tax years 2008 through 2011. The subjects of the tax are the buildings and other improvements to the leased real estate (collectively "improvements").

In August 2012, Southeast Housing filed the instant action which challenged the Property Appraiser's decision to tax the improvements. By agreement, tax years 2012 and 2013 were added to the suit. After a non-jury trial, the trial court entered final judgment for Southeast Housing. The Property Appraiser appealed.

ANALYSIS

**A. Exemption vs. Immunity.**

The over-arching issue in this case is whether the properties are taxable. There are two reasons why a property is not subject to tax: (1) the property is exempt; or (2) the property is immune. Exemption and immunity are often confused. Park-N-Shop, Inc. v. Sparkman, 99 So. 2d 571, 573-74 (Fla. 1957) ("[P]roperty of the state and of a county, which is a political division of the state . . . is immune from taxation, and we say this despite the references to such property in [some statutes] as being exempt.").

Exemption occurs when the taxing government, in a manner authorized by the state constitution, enacts a law excluding otherwise taxable properties from the

tax, typically because the properties are both used for a tax-exempt purpose and owned by a tax-exempt entity.[2] In contrast, immunity from taxation occurs when the taxing government simply lacks power to tax certain property because it is owned by a sovereign government.[3] In both situations, an analysis must be made to determine who owns the property.

---

[2] The Florida Constitution requires the Legislature to empower counties, school districts, and municipalities to levy ad valorem taxes on property. Art. VII, § 9, Fla. Const. But the Florida Constitution also mandates that certain property be exempt from taxation, such as property owned by a municipality and used exclusively for municipal purposes. Art. VII, § 3(a), Fla. Const. It also authorizes the Legislature to establish a limited number of exemptions for other types of property, such as portions of property predominately used for educational, religious, or charitable purposes. Id. Exemptions are ordinarily conditioned on compliance with application procedures, and legal challenges to the denial of exemptions can be subject to short and strict time limits for filing challenges under the governing statutes of non-claim. Ward v. Brown, 894 So. 2d 811, 816 (Fla. 2004) (holding lessees of property seeking exemption must comply with the sixty-day filing period for challenging a tax assessment).

[3] The property of the State of Florida and its political subdivisions are not exempt from ad valorem taxes, they are immune. They are immune because local governments simply lack the power to tax such property. Cason v. Fla. Dep't of Mgmt. Servs., 944 So. 2d 306, 309 (Fla. 2006) ("[T]he State is immune from taxation."); Orlando Utils. Comm'n v. Milligan, 229 So. 2d 262, 264 (Fla. 4th DCA 1969) ("[The freedom of municipal property from taxation] is an 'exemption' only, not an 'immunity' from taxation. Exemption presupposes the existence of a power to tax whereas immunity connotes the absence of that power. The state and its political subdivisions, like a county, are immune from taxation since there is no power to tax them."). Unlike exemptions, immunity from taxation, because it is based on the absence of the very power to tax, is not conditioned on compliance with application procedures or subject to the short statutes of non-claim that govern other challenges to assessments. Cason, 944 So. 2d at 316 (holding State's claim that property is immune is not subject to the sixty-day filing period for challenging a tax assessment).

**B. Federal Property is Immune from Taxation.**

Since the early years of the American Republic, it has been recognized that the property of the United States is immune from state taxation. "The federal government's immunity from state taxation was established by the United States Supreme Court in McCulloch v. Maryland, 17 U.S. (4 Wheat.) 316, 4 L.Ed. 579 (1819), with Chief Justice Marshall's well-known declaration that 'the power to tax involves the power to destroy.'" Fla. Dep't of Revenue v. Naval Aviation Museum Found., Inc., 907 So. 2d 586, 588 (Fla. 1st DCA 2005). With this background in mind, we turn to the issue we believe is dispositive of this case, namely, whether the United States owns the subject improvements.

**C. Trial Court: the Navy is the Equitable Owner.**

The trial court held "it is obvious to this Court that while Southeast Housing LLC is the titular owner of the subject parcels, true equitable ownership lies in the United States Navy." In so holding, the trial court relied upon two tax cases involving the issue of ownership for purposes of qualifying for an exemption under Florida law.

The first case relied upon is Leon County Educational Facilities Authority v. Hartsfield, 698 So. 2d 526, 528-29 (Fla. 1997), in which the Florida Supreme Court held that a government authority was the equitable owner of a dormitory and

10

cafeteria at a public university even though it did not own legal title. Legal title in the dormitory and cafeteria was held by a private corporation that raised funds by selling "certificates of participation" to private investors which were paid from the revenues generated by the dormitory and cafeteria. Id. at 527. The private corporation leased the property to the government authority, an exempt entity, which had the right to acquire title to the dormitory and cafeteria for one dollar once the certificates of participation were paid in full. Id. The government authority thus had the use, possession, control of the property, and the right to acquire title for a nominal amount. Legal title remained in the non-profit largely to secure payment of the certificates. In these circumstances, the Court held that "the project is not subject to ad valorem taxation because the Authority holds virtually all the benefits and burdens of ownership." Id. at 530.

The second case relied upon by the trial court was First Union National Bank of Florida v. Ford, 636 So. 2d 523 (Fla. 5th DCA 1993), which addressed whether a building used by a county for the location of its government offices was equitably owned by the county, an exempt entity, and therefore entitled to exemption from ad valorem taxes. Legal title to the building was held by a bank which leased the building to the county. Id. at 524. The building had been financed by selling "certificates of participation" to private investors which were paid from the rent paid by the county. Any revenues from the property in excess of the

11

payments to the investors and expenses of operation were owned by the county. The bank was paid a one-time fee for its services as trustee for this arrangement. Once the certificates were paid, the bank was required to convey legal title to the county. Id. Under these facts, the court held, "the County holds substantially all the burdens and benefits of ownership relating to the property sought to be taxed." Id. at 527. The bank, on the other hand, "holds merely the bare legal title to the land and improvements as security for the debt owed to the certificate holders." Id.

**D. The Property Appraiser's Argument.**

The Property Appraiser argues that the trial court erred in this regard because Southeast Housing held not only title, but also equitable ownership. In making this argument, the Property Appraiser relies upon three cases which held that a party was the equitable owner of improvements, even though they were required to return title and possession to the improvements after the expiration of a land lease.

In 1108 Ariola, LLC v. Jones, 139 So. 3d 857, 860 (Fla. 2014), private parties leasing government land for ninety-nine years were deemed the equitable owners of private homes and stores built on the land (and required to pay taxes on them) even though the government held title to the improvements and the improvements had to be returned at the end of the lease. Similarly in Offutt Housing Company v. Sarpy County, Nebraska, 351 U.S. 253, 261 (1956), a private

party leasing government land for seventy-five years to provide military housing was deemed the equitable owner of improvements (and required to pay taxes on them), even though the government held legal title to the improvements, which had to be returned to the government at the end of the lease. In Gay v. Jemison, 52 So. 2d 137 (Fla. 1951), apartments for military housing constructed by a lessee on lands leased for seventy-five years from the government were treated as property owned by the lessee (who was required to pay taxes on them) even though the government retained title and would receive possession of the improvements at the end of the lease.

### E. Who Owns the Improvements?

Where legal title to property is held by one party but other significant rights concerning the property are held by another party, the determination of who possesses equitable or beneficial ownership turns on the allocation between the parties of the property rights associated with the real estate. There is no single "stick" in the bundle of rights composing fee simple whose possession reflects equitable ownership; instead the allocation of the rights must be viewed in their entirety. Robbins v. Mt. Sinai Med. Ctr., Inc., 748 So. 2d 349, 351 (Fla. 3d DCA 1999) ("None of these factors, including an option to purchase, convey. . . equitable title. . . when considered individually."). Turning to the instant case, the

13

allocation of the underlying property rights between the Navy, BBC, and Southeast Housing indicates the Navy holds equitable ownership of the improvements.

1. Use of the Improvements is Limited to Military Housing, a Navy Purpose.

Although title to the improvements rests with Southeast Housing, the use of the improvements is essentially limited to military housing, serving the interests of the Navy. Of course, the purpose of the arrangements at issue in Offutt Housing and Gay, two of the cases relied upon by the Property Appraiser, were also to provide military housing, and, in those cases, the courts nevertheless found that private parties were the equitable owners of the housing complexes. This factor is consistent with Navy ownership but, by itself, determines little.

2. The Navy Oversees the Construction of Improvements.

The Navy retains a large element of control over the construction, repair, and maintenance of the buildings: the work must conform to its plans; it appoints a Resident Officer to inspect construction; it can direct the termination of the property developer and other construction officials. These are important property rights normally held by the owner. The possession of these rights by the Navy supports Navy ownership. Admittedly, however, limited circumstances exist where this level of control over construction is given by the owner to a third party without

surrendering ownership. Borrowers of construction loans, for example, often give lenders contractual rights to exercise similar powers during the life of the construction loan. See generally Rice v. First Fed. Sav. & Loan Ass'n of Lake Cnty., 207 So. 2d 22, 23 (Fla. 2d DCA 1968) (discussing the rights to inspect construction held by a lender of a construction loan). Thus, while this factor weighs in favor of a finding of Navy ownership, it is not dispositive.

3. The Navy Directs the Rental of the Housing Units.

Rental is at the heart of BBC's interest in the properties. Significantly, however, BBC is not free to rent the units to the most financially-attractive tenants at the highest rates the market will bear, as would normally be the case for property owned by private parties exercising the right to maximize profits from their private property. Instead, the Navy essentially controls the rental of the housing units, even down to naming the individuals who can rent, capping the amount of rent that can be charged those individuals, approving the form of the rental contracts, unilaterally deciding how utilities will be charged, and unilaterally setting the amount of relocation expenses paid to those individuals. The right to exercise control of the rental of the improvements is an important property right of the sort associated with ownership. On the other hand, similar controls occur where government transfers land or extends tax credits to developers in return for agreements to provide low income housing; and such agreements do not create

15

equitable ownership in government. See generally TEDC/Shell City, Inc. v. Robbins, 690 So. 2d 1323 (Fla. 3d DCA 1997). Again, this factor weighs in favor of finding Navy ownership, but does not, by itself, establish Navy ownership.

4. The Navy Controls Access to the Improvements.

Through security requirements that the Navy can impose and change at will, the Navy controls Southeast Housing's access to the improvements. At the same time, the Navy retains the right to access the properties and even enter individual housing units. The Navy's possession of these rights over the improvements strongly suggests Navy ownership because an owner would rarely grant a non-owner this level of control over its property.

5. The Navy Supervises the Operations of the Improvements During the Entire Term of the Lease.

After construction is completed and any debt is paid, the Navy continues to exercise important rights regarding the operation of the housing complexes. Among other things, the annual budget prepared by BBC is subject to the Navy's approval and the Navy has the right to order the termination of both the property manager and the asset manager, who in turn can be replaced only with the Navy's approval.

That the Navy exercises these rights, even after construction is completed and any debt is paid, undermines the argument that the Navy's role in this

arrangement is more akin to a lender or investor than an owner. It is difficult to envision circumstances where an owner would surrender these rights to a third party in an ongoing manner, unmoored to an event like the completion of construction or the payment of loans.

6. <u>The Navy Benefits from the Revenues and Receives the Lion's Share of the Profits.</u>

The agreements very carefully restrict the use and distribution of the revenues and profits, which are ultimately utilized in a fashion to protect the Navy's long-term interest in the improvements. Thus, the revenues from the project are used to replenish accounts that protect the Navy's interest before any profit is paid to a private party. And, when profits are distributed, ninety percent are placed in the Project Recapitalization Account, which the Navy controls and ultimately owns. If Southeast Housing were the owner of the properties and improvements, one would hardly expect it to allow the revenues and net income generated by the properties to flow to the benefit of the Navy in this manner.

Indeed, this distribution of revenue and income to benefit the Navy is the first major basis to distinguish the cases relied upon by the Property Appraiser. In <u>Gay</u>, for example, the Court found that the private party owned the military housing units it built on land leased from government in large part because the private party "receives the income from rentals" and "any profit for a period of seventy-five years belongs to it." <u>Gay</u>, 52 So. 2d at 139. Here, in contrast, the

private party does not reap the revenues and profits. Instead, the Navy benefits from the revenues and then retains a substantial amount of the profits.

Similarly, in 1108 Ariola, the Court found that the private parties owned the homes built on the leased land because, besides having untrammeled rights to mortgage or convey their leaseholds without prior approval, which does not occur here, "they have the right to rent their leasehold interests for the production of income; and they receive the full benefit of any capital gains or appreciation in the values of their properties." 1108 Ariola, 139 So. 3d at 859. Southeast Housing does not have these rights in the instant case.

Offutt Housing is a somewhat closer decision on this issue because, like here, the government prescribed maximum rents for the military housing at issue. Although the opinion does not describe how revenue and income from the property were distributed, the Court expressly relied upon the private party possessing "[t]he enjoyment of the entire worth of the buildings and improvements" during the long life of the lease. Offutt Housing, 351 U.S. at 261. The private parties here enjoy nothing like "the entire worth of the buildings and improvements."

These cases indicate that one indicium of equitable ownership is the right to receive the revenues and profit from the operations of the property. Southeast Housing does not have that right here. Instead, it is the Navy that stands to receive the most benefit from the revenue stream and any increase in the value of the

18

properties. Cf. Ward v. Brown, 919 So. 2d 462, 463 (Fla. 1st DCA 2005) (holding private lessees of government property on long term leases are equitable owners where they "have the right to use or rent the improvements, encumber their interests, transfer their property rights, and realize any appreciation in value from sale or rental income"). Thus, even under the cases relied upon by the Property Appraiser, the Navy's continuing and ongoing benefit from the revenues generated by the improvements and the Navy's ultimate ownership of a large share of the profits strongly indicate the Navy holds equitable ownership.

7. The Navy Takes Back the Improvements at the End of the Lease.

Owners of property are not usually bound to return property at no cost to the person who conveyed the property to them. For this reason, the requirement that the property be surrendered back at no or minimum cost has long been recognized as a sign that the holder of legal title does not have equitable ownership. See, e.g., Hartsfield, 698 So. 2d 526; Ford, 636 So. 2d 523. Of course, this factor must be considered in context: a party can be held to be the equitable owner even if it does not have the right to obtain title at the end of the lease. Accardo v. Brown, 139 So. 3d 848, 856 (Fla. 2014) ("[W]e also reject the petitioner taxpayers' argument that equitable ownership can exist under a leasehold only where there is a right ultimately to acquire legal title.").

19

It is on this point that the Property Appraiser particularly presses the holdings of Offutt Housing, 1108 Ariola, and Gay, all of which held that a party was the equitable owner of improvements, even when it was required to return title and possession to the improvements after the expiration of a land lease. Offutt Housing, 351 U.S. at 261; 1108 Ariola, 139 So. 3d at 860; Gay, 52 So. 2d 137. Relying on these cases, the Property Appraiser argues that Southeast Housing should also be recognized as the equitable owner of the improvements regardless of the fact that it must return title and possession of the improvements at the end of the lease.

On this point, however, Offutt Housing, 1108 Ariola, and Gay, are readily distinguishable. In each of those cases, the terms of the leases extended well beyond the useful lives of the improvements. In Offutt Housing, the land lease was for seventy-five years while "the buildings and improvements have an estimated useful life of [thirty-five] years. The enjoyment of the entire worth of the buildings and improvements will therefore be [the private party's]." 351 U.S. at 261. Because the useful life of the improvements would end before they had to be returned at the end of the lease, the United States Supreme Court held that the private party had equitable ownership of them. Id.

Similarly, in 1108 Ariola, the Florida Supreme Court focused on the fact that, given the ninety-nine-year lease, "'the probable useful life of the buildings'

20

would not exceed the limited term of the leasehold." 1108 Ariola, 139 So. 3d at 860 (quoting Gay, 52 So. 2d at 138). Likewise, in Gay, noting that the lease was for seventy-five years, the Court "[c]ompar[ed] the probable useful life of the buildings with the time for which the lease is to extend" and concluded that the useful life of the buildings will have ended before the buildings had to be returned. Gay, 52 So. 2d at 138-39.

In contrast, the record in this case reflects that the useful life of the improvements will extend beyond the term of the lease. First, the lease in the subject case (fifty years) is significantly shorter than the leases in 1108 Ariola (ninety-nine years), Housing (seventy-five years), or Gay (seventy-five years).

Second, contractual provisions indicate the improvements will receive ongoing repair and renovations during the life of the lease. The Navy exercises substantial control over the repair and replacement account and the Project Recapitalization Account, with eventual ownership over the latter. The existence of these accounts reflect an intent to ensure the ongoing repair and renovations to the improvements during the life of the lease.

Finally, the operating agreement requires the surrender of the improvements "in good, clean order and repair (ordinary wear and tear excepted)." Taken together, these facts indicate that the useful life of the improvements will extend beyond the term of the lease. The return of the improvements to the Navy in good

21

order, after the expiration of the lease, is a factor that heavily favors Navy ownership.

8. <u>The Transfer of Title Occurred in Order to Accomplish Something Other than the Transfer of Ownership.</u>

The concept of equitable ownership exists because paper title is sometimes transferred for reasons other than the conveyance of ownership. <u>Hartsfield</u>, 698 So. 2d at 529 (holding a property was owned by government and therefore exempt because "[t]he only reason legal title is held by [the private party] is to facilitate the financing of the project"). Indeed, the classic example of equitable ownership is where paper title is held by one party merely to guarantee the performance of the equitable owner. <u>See, e.g.</u>, <u>S. R. A., Inc. v. State of Minn.</u>, 327 U.S. 558, 570 (1946) (recognizing a state could tax property sold by the United States to a private party after ownership of the beneficial interest had passed to the private party even though legal title was retained by the United States because, at that point, the United States held bare legal title only as security).

Here, Southeast Housing contends that the purpose of the temporary transfer of bare legal title was for two reasons: (1) to finance the project by issuing private debt; and (2) to allow the joint venture to charge the military tenants the full amount of the basic housing allowance provided to them by the Department of Defense, which by federal law can be paid only to "non-governmental entities." Title was transferred, in other words, not to establish fee ownership in Southeast

Housing, but to issue private bonds and to create a technicality that will allow the Navy and Southeast Housing to circumvent a restriction in federal law. The Property Appraiser does not dispute these contentions. Without endorsing the latter explanation or commenting on its legal efficacy, we note that these two explanations provide a coherent reason why legal title was transferred to Southeast while most of the vital aspects of ownership were retained by the Navy.

9.  The Navy, not Southeast Housing, is the Equitable Owner.

Based on the analysis set forth above, we find that the trial court was correct. The Navy, and not Southeast Housing, has its ultimate purpose (military housing) served by the agreement, oversees construction, controls access to the properties, supervises operations, directs the rental of the properties, continues to benefit from the revenue, receives the lion's share of the profits, and takes back title to the properties at the end of the lease within the useful life of the improvements. Thus, regardless of Southeast Housing's possession of legal title, the Navy is the equitable owner of the improvements because it "holds virtually all the benefits and burdens of ownership." Hartsfield, 698 So. 2d at 530; Ford, 636 So. 2d at 527.

**F.  Did the United States Consent to Taxation?**

23

The Property Appraiser additionally argues that the United States has consented to taxation of the properties and improvements. In support, he directs our attention to section 2667(f) of Title 10 of the United States Code which provides that the "interest of a lessee of property leased under this section may be taxed by State or local governments." As expressly acknowledged in the ground lease, however, the subject leases were issued pursuant to section 2878 of Title 10, which provides the "conveyance or lease of property or facilities under this section shall not be subject to . . . Section 2667 of this title."

On this point, we again distinguish Gay, 52 So. 2d 137, and Offutt Housing, 351 U.S. at 260-61, both of which held that the United States had consented to the taxation of military housing owned by a private entity on land leased from the United States for seventy-five years under a program different from the Military Housing Privatization Initiative. See generally Green v. Eglin AFB Hous., Inc., 104 So. 2d 463, 468 (Fla. 1st DCA 1958) (reaching a result different from Gay and noting that "[t]he plan under which the project under consideration in the [Gay] case was constructed and operated was developed under the then existing Federal statute" and "[t]hat statute has been materially changed").

The Property Appraiser also notes that BBC was required to submit a pro forma that assumed the properties and improvements would be subject to state and local taxation and that the ground lease mandated that BBC "shall be responsible

24

for the payment of any applicable and enforceable taxes." These provisions are too equivocal to constitute a consent to taxation. As the United States Supreme Court explained regarding a similar provision in a different lease, "we see nothing more in this standard contractual provision than a precaution on the Government's part to guard itself against liability for payment of any state taxes 'lawfully assessed' against its lessee." Humble Pipe Line Co. v. Waggonner, 376 U.S. 369, 374 (1964). We therefore hold that the United States has not consented to taxation.

CONCLUSION

Because properties owned by the Navy are immune from taxation and the Navy retained beneficial ownership of the improvements at issue, the subject improvements are immune from state ad valorem taxation.

Affirmed.